HENRY KUNTZ

*v.*

LAURENT J. TONNELE et al.

[Decided September 13th, 1912.]

1. Where the purchaser's agent in fraud of his principal's rights enters into a secret arrangement with the vendor, under which the agent receives a commission on the sale, the agent is liable to his principal for the amount of such commission, though he would not have been so liable had his principal consented.

2. Where there was no fraud in respect thereto in which he participated, a vendor was not liable to the purchaser for a commission paid to the purchaser's agent out of that part of the purchase money representing the lowest price at which he offered to sell the property.

3. Where a vendor pursuant to a secret agreement with the purchaser's agent added a certain amount to the consideration price and paid such amount to the agent, this constituted a fraud upon the purchaser for which the vendor was separately liable.

4. Where a purchaser after paying part of the purchase price, but before the conveyance is made, discovers that pursuant to a fraudulent agreement between his agent and the vendor a certain amount has been added to the price, and he files a bill in equity to require a conveyance of the property to him upon his paying the balance of the agreed price less the amount of his damage and the amount already paid, the court of chancery should retain jurisdiction of the suit.

5. A purchaser's damages arising from an increase of a specific amount in the purchase price pursuant to a fraudulent agreement between his agent and the vendor, being certain and definite, were liquidated damages.

6. There are certain actions for unliquidated damages for torts, of which equity, by reason of fraud, has jurisdiction.

7. A court of equity will not decree specific performance to a vendor who has fraudulently misrepresented the purchase price.

Final hearing on pleadings and proofs in open court.

*Mr. George S. Silzer* and *Mr. John A. Coan,* for the complainant.

*Messrs. Herrmann & Steelman,* for the defendants.

GARRISON, V. C.

It will be necessary to make a recital of the salient facts upon which the decision rests. Briefly stated, they are as follows:

Tonnele was the owner of a piece of property at Metuchen, New Jersey. (Incidentally, he had parted with the legal title to a man named Albanesius, who held the same to secure a loan of some $7,000.) At one time Kuntz had negotiated with Tonnele for the purchase and sale of this property, but failed to reach a bargain. Subsequently, Shenckman, who is a brother-in-law of Kuntz, and who occupied a suite of offices in New York City with Kuntz, took up negotiations with Tonnele. Shenckman informed Kuntz that he was associated in some banking enterprise with Tonnele, and thought he could get the property for Kuntz cheaper than Kuntz could get it if he conducted the negotiations himself. When Shenckman got together with Tonnele, Tonnele agreed to sell the property for $14,000, and Shenckman demanded a commission of $700 from Tonnele, which Tonnele agreed to pay him.

Shenckman told Kuntz that the price was $15,000, and Kuntz prepared a contract between a man named Senft, who was his dummy, and Tonnele, by which Tonnele was to sell the property to Senft for $15,000.

On the 6th of August, 1909, Tonnele, Herrmann, Tonnele's lawyer, and Shenckman met at Shenckman's office, which, as above stated, was also Kuntz's office, but Kuntz was not present at the time. Before this time this contract had been submitted to Herrmann, acting for Tonnele, and he had made certain changes therein. On the 6th of August aforesaid, Tonnele spoke of the increase in the price as evidenced by the written contract, and expressed his gratification that he was to secure $1,000 more than he and Shenckman had agreed upon in their previous negotiation. Shenckman then informed Tonnele that this extra $1,-000 was not to go to Tonnele, but to him, Shenckman. To this Tonnele demurred. Finally, he agreed, and a paper was drawn up and signed, by which Tonnele authorized Shenckman to sell the property for him at $15,000, for doing which Shenckman was to receive $1,750 as commission. (The additional $50 is not explained by anybody.) Thereupon Tonnele signed the con-

tract between himself and Senft for the sale to Senft at $15,000
—Senft having already signed the same.

Either contemporaneously therewith (or theretofore) Senft
had assigned the contract between himself and Tonnele to Kuntz.
The $1,750, which the contract provides to be forthwith paid,
was paid by Kuntz; and $1,300 was forthwith paid by Tonnele
to Shenckman.

Subsequently, and within a few days after the 6th of August,
1909, Kuntz paid the additional $250 required by the contract.
On the 4th of October, desiring to secure an adjournment, he
paid $500 more on account of the contract, and secured an ad-
journment to November 11th or 12th. On this last-mentioned
day he desired to secure another adjournment, and paid $500
more on account of the contract, and secured an adjournment to
November 26th, 1909. At the time of securing this last ad-
journment—that is, either the 11th or 12th of November, 1909—
he learned from Herrmann, who was acting for Tonnele, and
who granted the adjournment, and received the $500 then paid,
that his agent, Shenckman, in the negotiations had secured $1,-
700 or $1,750 commission for himself. Shortly after learning
this from Herrmann, Kuntz met Tonnele on a railroad train and
told Tonnele what he had learned and got a fuller statement of
the facts from Tonnele. Between this time and the 26th day of
November, 1909, and on the 26th day of November, 1909, there
were various interviews between the parties. Taking Kuntz's
own version as true, it appears that he took the position that he
should get the property upon paying $13,300, and no more, and
that he would pay this and take the title; and they took the po-
sition that he must pay the full $15,000. He finally, on the 26th
of November, 1909, according to his own version, offered either
to pay $13,300 and take the title, or to pay $15,000 and take the
title provided they gave him a bond conditioned to repay to him
the $1,700 as commissions allowed Shenckman if he proved that
Shenckman was not entitled to the same. This they declined to
do, insisting that he must pay the $15,000. Their version is that
at the time that he made the offer to pay the $15,000, it was not
upon any condition of the sort that he now states, but that his
offer was to give them checks dated ahead, they to deposit a deed

with Mr. Herrmann in escrow, who was to deliver the deed to him when the checks were cashed.

Subsequently, and on the 7th day of December, 1909, Kuntz filed his bill in this suit against Tonnele, Ryer and Shenckman. He included Ryer because he alleged that Ryer had made some agreement with Shenckman to obtain from Shenckman some portion of the money which Shenckman was obtaining out of the transaction. (Ryer was eliminated from the suit.) Briefly stated, his bill, after reciting the contract between Senft and Tonnele and the assignment thereof to him, Kuntz, referred to the previous negotiations between himself and Tonnele which fell through; stated the intervention of Shenckman in the matter; the authority by him to Shenckman to negotiate for him; the ascertainment by him from Herrmann of the facts concerning · the agreement to pay commissions to Shenckman; alleged that, in reality, the contract between Tonnele and Shenckman was that the purchase price was to be $14,000 instead of $15,000, and that of said $14,000, $700 was to be paid to Shenckman; charged that Tonnele and Shenckman had agreed that the contract price should be represented to Kuntz as $15,000, and that the $1,700 in excess of the amount that Tonnele was to receive was to be equally divided between Tonnele, Ryer and Shenckman; that the whole transaction was a scheme to defraud Kuntz out of $1,700 and compel him to pay for the property the sum of $15,000, whereas the true amount which Tonnele was to receive was the sum of $13,300.

After a prayer for discovery he prays that

"the said parties may be decreed to have conspired together to defraud your orator out of the sum of seventeen hundred dollars, and further decreed to surrender and deliver up to your orator the said sum of seventeen hundred dollars; and that the said Tonnele * * * may be decreed to convey and transfer to (your orator) the said property * * * upon the payment by (Kuntz) to them the sum of thirteen thousand three hundred dollars, less the amount already paid."

Subsequently, there was an amended bill filed which, so far as I can see, does not differ from the original bill, excepting that it includes Albanesius as one against whom he prays relief, and only against him because he held the legal title.

The defendants Tonnele (I have not mentioned the wife throughout these proceedings because it was unnecessary to do so) filed an answer and a cross-bill. The answer practically consists of denials of the allegations of the bill; and the cross-bill prays that the complainant be required to specifically perform the contract and pay the balance of the $15,000 purchase price mentioned therein.

Shenckman, though a party to the bill, has not been served nor brought into the suit in any other manner.

The proofs entirely fail to sustain the charges of the bill that Tonnele agreed with Shenckman that he, Tonnele, should have a portion of the commissions allowed to Shenckman. Kuntz testified that Tonnele told him that this was so, but the written papers and the testimony of all the other witnesses convince me that it was not so. I think that there has been a sufficient recital of facts to demonstrate the two aspects in which the case must be treated.

In my view, two entirely distinct propositions are presented, one having relation to the claim of the complainant with respect to the $700 of commission which was to go to Shenckman from Tonnele out of the $14,000 consideration, and the other having to do with the $1,000 of commission allowed by Tonnele to Shenckman which was to come out of the $15,000 purchase price.

The facts present this situation: Tonnele agreed with Shenckman to sell the property for $14,000, and agreed, out of that consideration, to pay to Shenckman as a commission $700. Subsequently, Shenckman conceived the idea of defrauding Kuntz out of a thousand dollars. The method to be pursued in perpetrating the fraud was to induce Tonnele to join with him in representing to Kuntz that the price was $15,000 instead of $14,000, and, if successful in extracting this extra $1,000 from Kuntz, it was to go to Shenckman.

With respect to the $700, it seems to me entirely clear that Shenckman was responsible to Kuntz for this, and that unless Kuntz had permitted Shenckman as his agent to become the agent of the other party, or to obtain a commission from the other party, Kuntz unquestionably would have the right to recover this $700 from Shenckman. But I do not see any aspect

of the case, or of the law, which would give Kuntz any right of action, legal or equitable, against Tonnele with respect to this $700. There is not the slightest evidence to show that Tonnele engaged in any fraud with respect thereto. There is not the slightest evidence to show that Tonnele ever agreed or offered to sell his property for less than $14,000; and if out of that consideration he chose to give Shenckman $700 as a commission, Kuntz does not acquire any right of action on that account against Tonnele. His sole remedy is against his agent for obtaining a secret profit or commission out of his business.

The cases which hold that the principal has such a right of action as against his agent are too numerous for citation, and the principle is too well settled to require more than mention. The theory upon which such recovery is based entirely excludes any idea that a recovery in such case is possible against anyone other than the agent receiving the secret profit. The theory is that whatever an agent makes in his principal's business belongs to the principal. The theory upon which Kuntz here is endeavoring to recover against Tonnele with respect to the $700, must be based upon fraud—fraud, that is, on Tonnele's part—and there is no proof of any fraud upon Tonnele's part with respect to this $700. Whether or not it was a fraud on Shenckman's part entirely depends upon the contract, agreement and relationships between Kuntz and Shenckman. If Kuntz had permitted Shenckman to act as agent for both parties, as is very often the case, or had left him free to obtain a commission from the other side if he could, there would have been no fraud upon anybody's part. If, on the contrary, Shenckman was not free to accept anything from Tonnele, the only person to take advantage, if he did so, was Kuntz, and the only person against whom Kuntz had any complaint, legally or equitably, was Shenckman.

Entirely a different situation is presented with respect to the $1,000 added to the consideration price. Here there was clear fraud on the part of Tonnele and Shenckman against Kuntz. Tonnele, to obtain a thousand dollars out of Kuntz for Shenckman's benefit, misrepresented the consideration price to Kuntz, having agreed with Shenckman that he would give him this $1,000 thus extracted from Shenckman's principal. A cleaner-

cut case of fraud could not well be conceived. Unquestionably, there arose out of this situation a right of action by Kuntz against Shenckman and also against Tonnele. The liability is not joint. The action is not joint. The parties do not have to be sued together. The bases of recovery are different. In the action against Shenckman the basis of recovery, as above set forth, is the right of the principal to have whatever the agent got out of the transaction. The basis of the action against Tonnele is the fraud on Tonnele's part in misrepresenting the price and thereby occasioning damage and loss to Kuntz.

A case exactly in point, dealing fully, comprehensively and clearly with all of the questions, is *Mayor and Aldermen of Salford* v. *Lever (1891), 60 L. J. Q. B. 39; 1 Q. B. 168.* I shall make extensive quotations therefrom because there will thus be shown the similarity of facts and the statement and determination of the questions involved more satisfactorily than could be done by paraphrase.

The plaintiff was a municipal corporation which was in the market to purchase large quantities of coal. Hunter was its agent to purchase same. The defendant was a coal merchant to whom Hunter gave orders to supply coal to plaintiff.

Lord Esher, master of rolls, said:

"The corporation of Salford have brought this action against the defendant, who is a coal merchant, and it is an action founded on fraud * * * (at *p. 175*). The defendant was at liberty to sell the coals at any price he would get for them, not necessarily at the market price, but the best price which he could obtain. He was bound, however, to act honestly. He offered this man Hunter to sell him coal at a price which would give him such a profit as he desired. But then Hunter tempted him by saying: 'You want to sell your coals at a price which will give you a profit. I have the power of buying coals from you or from anybody else, and I will not buy them from you at the price at which you are selling them, unless you will help me to cheat the corporation out of another shilling a ton. You are to have your price; but you are to add to it in the bills which you send to the corporation another shilling per ton making the real price apparently a shilling per ton more; but that shilling is to be mine

—you are to give it to me.' They called this a commission, * * * and commissions sometimes cover a multitude of sins. In the present case, it was meant to cover a fraud. The fraud was this, that the defendant allowed and assisted the agent of the corporation to put down a false figure as the price of the coals in order to cheat the corporation out of a shilling a ton, which was to be paid to their own agent; and the way in which it was to be done was this, the defendant sent in a bill to the corporation for the whole price thus increased. He got the advanced price into his hands, and as he got it by fraud he is bound to pay it back, unless something has happened to oust the right of the corporation. The damage to the corporation is clearly the one shilling per ton out of which they have been cheated, neither more nor less. The form of the action, on which some stress has been laid in the argument, is immaterial. Unless something has happened to oust the right of the corporation, they are entitled to sue the defendant for the one shilling a ton in one form of action or another, although he has parted with the money and has paid it over to his confederate, Hunter, because it was once in his hands and he is liable for the fraud to which he was thus a party * * * (at *p. 176*). If an agent takes a bribe from a third person, whether he calls it a commission or by any other name, for the performance of a duty which he is bound to perform for his principal, he must give up to his principal whatever he has by reason of the fraud received beyond his due. It is a separate and distinct fraud of the agent. He might have received the money without any fraud on the person who was dealing with him. Suppose that the person thought that the agent was entitled to a commission, he would not be fraudulent; but the agent would be, and it is because of his separate and distinct fraud that the law says he must give up the money to his principal, * * * and therefore he is entitled to recover from the agent the sum which he has received. But does this prevent the principal from suing the third person also, if he has been fraudulent, because of his fraud? It has been settled that he cannot set up the defence that the action cannot be maintained against him because the thing was done through the agent and the principal was entitled to sue the agent. What difference can it make

that the principal sues the third party secondly instead of first? The agent has been guilty of two distinct and independent frauds —the one in his character of agent, and the other by reason of his conspiracy with the third person with whom he has been dealing. Whether the action by the principal against the third person was the first or the second must be wholly immaterial. The third person was bound to pay back the extra price which he had received, and he could not absolve himself or diminish the damages by reason of the principal having recovered from the agent the bribe which he had received."

Lord-Justice Lindley (at *p. 179*) : * * * "It is obvious that in some form of action the corporation have a right to recover this shilling a ton from the coal merchants. Under the old practice I think they could have recovered it by an action for money had and received; and probably they could have recovered it in more ways than one (at *p. 180*). It would be paradoxical if the rights of the corporation were to depend upon the accident which of the two wrong-doers they sued first. * * * The corporation has a separate cause of action against each of them, and not one cause of action against both or either of them."

Lord-Justice Lopes (at *p. 181*) : "The rights of action by the corporation against him" (the defendant) "and Hunter are separate, distinct and independent of each other. The right against Hunter is to recover the secret bribe which he has received, and it is founded on his fraud in regard to that bribe. The right against Lever is to recover the excess of price which he obtained through his fraud—a fraud, no doubt, in conjunction with Hunter, but an entirely separate and distinct fraud from that in respect of which the action against Hunter would be brought. It is said that these two actions cannot co-exist. I think that contention cannot be supported * * *."

The sole question, therefore, left for determination, is whether this jurisdiction should, in this state, be exercised in the court of chancery. There does not appear to be the slightest doubt of the existence of the jurisdiction and of its use in the court of chancery of England. *Pomeroy (3d ed.) § 912*, says:

"The doctrine is fully settled by an unbroken line of decisions extending to the present day, that, with one remarkable exception, the jurisdiction of equity exists in and may be extended over *every* case of fraud, whether the primary rights of the parties are legal or equitable, and whether the remedies sought are equitable or simply pecuniary recoveries, and even though courts of law have a concurrent jurisdiction of the case and can administer the same kind of relief. The English judges have virtually said that in every case of fraud the remedy at law, either from the nature of the legal relief itself or from the methods of legal procedure, is inadequate. The only question, therefore, presented to an English court is, not whether the equitable jurisdiction *exists*, but whether it should be exercised. * * * The full jurisdiction of equity having thus been established from the earliest time, it should not, in accordance with familiar principles, be at all affected by a subsequent growth of a similar common law jurisdiction. To say that the full jurisdiction of equity has been any way abridged, impaired or altered, because the law courts have gradually assumed and finally acquired a like jurisdiction, even though competent in many cases to administer adequate relief, is to violate one of the most fundamental principles regulating the general equitable jurisdiction. The sum of the English doctrine, therefore, is, that, although the jurisdiction always exists, whether it will be exercised depends upon the circumstances of individual cases."

Mr. Justice Dixon, speaking for our court of errors and appeals in the case of *Eggers* v. *Anderson (1901), 63 N. J. Eq. (18 Dick.) 264,* said: "Undoubtedly, the American courts have not generally upheld so broad a jurisdiction. * * * But New Jersey is distinguished from her sister states by her adherence to the standards of the mother country respecting both rights and remedies in equity, and I know of no constitutional or statutory provision or judicial decision in this state which can be regarded as withholding or withdrawing from our court of chancery any jurisdiction possessed by its English prototypes."

This doctrine, thus enunciated, has received frequent and emphatic reiteration in subsequent cases.

The single question left for determination, therefore, is whether the undoubted jurisdiction of this court should be exercised in this case, or whether, in the discretion of the chancellor, the complainant should be left to his remedy at law? In certain cases which affirm the broad jurisdiction of equity in all cases of fraud, the discretion has been exercised against retaining the case in equity, and the parties have been relegated to their suits at law. *Krueger* v. *Armitage (Vice-Chancellor Emery,*

*1899), 58 N. J. Eq. (13 Dick.) 357; Polhemus v. Holland Trust Co. (Vice-Chancellor Reed, 1899), 59 N. J. Eq. (14 Dick.) 93.*

In others the court of equity has administered the appropriate relief: *Dawson* v. *Leschziner (Chancellor Magie, 1906), 72 N. J. Eq. (2 Buch.) 1; Mazolla* v. *Wilkie (Vice-Chancellor Garrison, 1907), 72 N. J. Eq. (2 Buch.) 722; Safford* v. *Barber (Vice-Chancellor Walker, 1908), 74 N. J. Eq. (4 Buch.) 352; Schoenfeld* v. *Winter (Vice-Chancellor Howell, 1909), 76 N. J. Eq. (6 Buch.) 511;* on demurrer, *Strauss* v. *Norris (Vice-Chancellor Stevens, 1910), 77 N. J. Eq. (7 Buch.) 33;* same case on final hearing *(Vice-Chancellor Howell, 1911), 78 N. J. Eq. (8 Buch.) 488.*

In *Krueger* v. *Armitage, supra,* the court of chancery declined to exercise jurisdiction in an action grounded upon fraud because the remedy at law was entirely adequate and the court saw no reason why the case should not go there.

In *Smith* v. *Krueger (Vice-Chancellor Emery, 1906), 71 N. J. Eq. (1 Buch.) 531,* the court, after referring to *Eggers* v. *Anderson* (which had been decided after *Krueger* v. *Armitage* and before *Smith* v. *Krueger*), exercised its discretion to retain jurisdiction because there were equitable features requiring treatment in a court of chancery. In the latter case the court said (at *p. 536*), speaking with respect to *Krueger* v. *Armitage:* "The claim for damages, in addition, was based upon the same alleged fraud. This issue of fraud * * * in the sale being properly here, the court, in exercising its concurrent jurisdiction, should dispose of the issue of fraud and of damages resulting from it in a single action and for all purposes."

Excellent illustrations in addition to *Eggers* v. *Anderson* of cases retained in equity, although the sole relief prayed for was an award of pecuniary damages, are *Winans* v. *Winans (Chancellor Zabriskie, 1868), 19 N. J. Eq. (4 C. E. Gr.) 220,* and *Ryon* v. *Loveless (Vice-Chancellor Reed, 1902), 51 A. R. 1094; affirmed (Court of Errors and Appeals, 1903), 65 N. J. Eq. (20 Dick.) 405.* In this latter case, Ryon, a real estate agent, had agreed with Loveless, the owner of property, to purchase the same for $16,000. Ryon agreed to sell the same property to Fishblatt for $19,500. The deeds were to be exchanged on the same day,

at the same place.  Fishblatt did not attend.  Ryon did not have
the money to buy from Loveless, and nothing was done.  Subse-
quently, Fishblatt and Loveless met by accident, and Fishblatt
learned that Loveless had not sold to Ryon, whereupon Fishblatt
bought the property from Loveless for $1,000 more than Ryon
had agreed to pay Loveless, and $2,500 less than Fishblatt had
agreed to pay Ryon.  Thereupon Ryon sued Loveless and Fish-
blatt, and obtained no relief whatever against Loveless, who was
permitted to keep her $1,000 profit that she had made; but did
obtain a decree for the $2,500 profit which she lost by reason of
Fishblatt's having bought the property directly from Loveless
and not from Ryon.

It has been suggested that the expression is quite often found
in cases in this state that unliquidated damages for a tort can-
not be recovered in equity.  The first answer is that the damages
dealt with in the case at bar cannot in any proper use of the
word be denominated "unliquidated"—that is, the damages as
against Tonnele.  "Unliquidated damages," properly so called,
are those which are not ascertained, that is, in which some ele-
ment of uncertainty as to the amount exists which must be settled
before a proper determination has been reached.  In this case
there is no element of uncertainty as to the amount of damages
whatever.  The $1,000 which Tonnele misrepresented with re-
spect to the consideration price is the certain, definite and liqui-
dated sum of damage which his fraud caused to Kuntz.  But, in
passing, I think it proper to say that the statement above re-
ferred to that unliquidated damages for a tort cannot be recov-
ered in equity is too broad, and probably was not, by any of the
judges who used it, meant to apply to cases where equity, by
reason of fraud, has unquestioned jurisdiction.

In considering the question whether this suit should be re-
tained in this court, or the complainant remitted to an action at
law, certain cogent facts should be borne in mind.  It should first
be remembered that the title to this property is under the control
of the defendant Tonnele; that Kuntz, by a written agreement,
has bought the property from him; that he is entitled to the
benefit of the bargain free from the fraud which tainted it; that
he had a right, upon discovering the fraud, either to rescind and

restore the parties to their original position, or to affirm the contract and sue for the damages accruing to him by reason of the fraud—*Conlin* v. *Roemer, 52 N. J. Law (23 Vr.) 53* (at *p. 58*) ; that he elected to do the latter; and that a necessary part of his relief is a decree requiring Tonnele to convey the property to him. There can be no possible question that if this case be viewed as one in which the complainant was entitled to come into equity to obtain specific performance, this court, as incidental to the relief, could and should award the damages accruing to the complainant.

To prevent circuity of action, this court, in my view, should maintain jurisdiction in this suit to administer relief with respect to this $1,000 fraudulently extracted from the complainant by the fraud of the defendant Tonnele. Unless this court does retain jurisdiction the result would be that Tonnele would receive from Kuntz $15,000. Kuntz would be entitled, at law, to recover from Tonnele the damages arising out of Tonnele's fraud, which would be $1,000. To prevent this circuity, this court, in this suit, without violating any principle that I know of, and in consonance with the authorities and precedents, may decree that Tonnele should convey the property upon receiving that to which he is entitled, namely, $14,000, and that the $1,000 of the $15,000 consideration money which was fraudulently inserted in the contract should not be paid over and returned, but should be retained by Kuntz. In this way complete justice is done the parties and circuity of action is avoided— thus, in my view, showing that this is peculiarly a case in which the discretion to retain the suit in equity should be exercised.

The suggestion that the case is in anywise altered by reason of the fact that Tonnele has paid $1,300 to Shenckman was fully met and disposed of by the quotations heretofore made from the case of *Mayor and Aldermen of the Borough of Salford* v. *Lever, supra.*

The decree will therefore be that, upon the payment by Kuntz to Tonnele of enough money to make $14,000 in all, in the manner provided by the contract, Tonnele shall convey the premises in question to Kuntz.

With respect to the cross-bill filed by Tonnele against Kuntz,

calling upon Kuntz to specifically perform the contract by paying $15,000, this should be dismissed, with costs, not only because the court has found, for the reasons above stated, that Tonnele is not entitled to this relief, but because, in any event, a court of equity would not give the relief of specific performance to a vendor whom it found had fraudulently misrepresented the purchase price.

The decree will be settled upon notice.