Argued October 28, reversed December 7, 1915, rehearing denied January 18, 1916.

# HALL v. CATHERINE CREEK DEVELOPMENT CO.*

(153 Pac. 97.)

**Corporations—Representation by Promoter—Rescission of Contract—Fraud.**

1. Plaintiffs appointed as their agent, to sell land on commission, one whom they knew to be interested in promoting a corporation to buy lands for development purposes. They gave such promoter an option to buy the land at the regular selling price. The land was sold to the corporation, a portion of the purchase price being paid in cash and a mortgage executed by the corporation to plaintiffs for the balance. The corporation, on discovering the fraud, rescinded the pur-

*On liability of promoter on sale to corporation of property for sale of which promoter is agent, see note in 18 L. R. A. (N. S.) 1115.

On waiver of promoter's right to rescind, see note in 30 L. R. A. (N. S.) 872.   REPORTER.

chase, tendered back a deed, and demanded repayment of the advance payment on the price. *Held*, in a suit to foreclose a mortgage, that defendant corporation was entitled to a cancellation of the note and mortgage and to a judgment for the amount paid on the purchase price.

[As to rights and liabilities of promoters, see note in 17 **Am. St. Rep.** 161.]

**Corporations—Promoter's Contract—Rescission—Laches.**

2. The fact that defendant corporation did not rescind the contract for some months after the execution of the note and mortgage at which time they received definite notice of the facts constituting the fraud did not constitute such laches as to preclude the assertion of the right to rescind in a foreclosure suit brought shortly after the discovery of the fraud.

**Vendor and Purchaser—Rescission—Interest.**

3. A purchaser of land who rescinds the contract on the ground of fraud cannot recover interest on a payment made on the price, where he had possession of the land during the time the contract remained in force.

From Union: JOHN W. KNOWLES, Judge.

In Banc.    Statement by MR. JUSTICE BURNETT.

This is a suit by G. F. Hall, W. A. Hall and M. M. Hall against the Catherine Creek Development Company, a corporation, to foreclose a mortgage on land in Union County, securing three promissory notes of $7,000 each.

With a few exceptions, not important to the discussion, the complaint is admitted. In substance the defense is that one W. B. Wilson was a promoter and organizer of the defendant corporation, and was at the same time in the secret employ of the plaintiffs, who had agreed to give him $3,000 if he would effect a sale of the premises at $36,000; that the defendant was organized for the purpose of purchasing and developing the real estate involved, all with the cognizance of the plaintiffs. The purport of the remainder of the answer is that during all the negotiations the plaintiffs were aware of the double dealing of the promoter Wilson, and, in ignorance of his secret understanding and agreement with them the defendant paid $15,000

of the purchase price in cash, giving the notes and mortgage mentioned in the complaint in discharge of the balance; that, having afterward ascertained the secret arrangement mentioned, the defendant repudiated the transaction, tenders a deed reconveying to the plaintiffs the land, and demands the return of the installment paid in money.

The reply denies the substantial part of the new matter of the answer. It avows that for at least three years prior to the defendant's purchase of the land Wilson was employed by the plaintiffs to find a buyer for the realty, with the understanding between him and them that if he were successful, he would be well compensated therefor; that in the month of August they made, executed, and placed in escrow their promissory note for $3,000 to him to be delivered to him when the sale should be consummated, and that it was so delivered about September 7, 1912, when the land was sold. The plaintiffs disclaim any knowledge that Wilson was in any way interested in the purchase, or that he had anything to do in organizing or incorporating the defendant company, and aver that they acted in good faith in the whole transaction. After a hearing, the Circuit Court entered a decree according to the prayer of the complaint, and the defendant appeals.      REVERSED.   REHEARING DENIED.

For appellant there was a brief over the names of *Mr. James D. Slater* and *Messrs. Beach, Simon & Nelson,* with oral arguments by *Mr. Slater* and *Mr. Roscoe C. Nelson.*

For respondents there was a brief over the names of *Messrs. Crawford & Eakin* and *Mr. B. F. Wilson,* with oral arguments by *Mr. Crawford* and *Mr. Eakin.*

MR. JUSTICE BURNETT delivered the opinion of the court.

1. It seems to be unquestioned that as a matter of fact Wilson had been employed by the plaintiffs to find a purchaser for the land at $36,000, and that they agreed to pay him $3,000 for his services without the knowledge of the corporation or any of its officers or stockholders, except Wilson himself. It is without dispute that he did assist in the formation of the company, became a stockholder and officer therein, and was such official at the passing of the title. It is common learning that as between the corporation and its double dealing promoter such a transaction is fraudulent. The vital question in this case, however, is to determine how the plaintiffs here, the grantors in the conveyance, are affected. It is disclosed by the testimony that they not only commissioned Wilson to find a purchaser for the land like any ordinary real estate broker, but also equipped him with an option to purchase the same for himself at the price of $36,000. The president of the corporation, who was also one of its promoters and organizers, testified to the effect that Wilson enlisted him in the project of the purchase and development of the tract and ultimately assigned to him a half interest in the option; that together he and Wilson went to view the premises in company with one of the plaintiffs, G. F. Hall, and discussed in his presence the formation of the corporation in which both Wilson and Kingsbury, the subsequent president, were to be interested for the purpose of taking over the property and carrying on the scheme of development; and that plaintiffs knew the relationship Wilson sustained to the prospective company. According to his statement, Kingsbury, after the sale,

inquired of G. F. Hall about a possible commission having been paid to Wilson, when Hall reluctantly admitted that they had given him something, but refused to state the amount, referring the inquirer to Wilson himself. At the first opportunity Kingsbury propounded the same query to Wilson, who flatly denied that he received any compensation whatever from the plaintiffs. Afterward, however, having secured an additional clue from another source, the witness again taxed G. F. Hall with the matter, and thus relates the result:

"He said, 'Well, there is no use beating around the bush. I know you have got all the information; you got it from Mr. Fear at the bank'; and he said, 'We did pay Wilson a $3,000 commission.'"

Thereupon Kingsbury, as president of the defendant, demanded a rescission of the contract and a return of the $15,000. Wilson subsequently made written admission of the fact that he had received that amount of money from the plaintiffs for his services. The principal evidence coming from the plaintiffs on this point is found in the cross-examination of G. F. Hall:

"Q. Now, isn't it a fact that you told Mr. Kingsbury just in the words he gave in his testimony here—'I see you have got the whole thing; I had just as well own up'—or words to that effect?

"A. I don't think it was in that language.

"Q. Wasn't in that language? Well, it was something like that, wasn't it?

"A. I told him that he knew the amount, and it wasn't necessary—well, I don't know but what I used the words he said; beat around the bush. * * "

On the knowledge of plaintiffs concerning Wilson's interest in the corporation the same witness testified as follows:

"Q. Didn't you know that he had an interest and intended to take an interest in the development of that property?

"A. I knew he was interested in getting the thing going, but I didn't know what his interest was.

"Q. Oh, you didn't know what his interest was?

"A. No, sir.

"Q. You knew all of the time that he was intending to take an interest in the development of the property?

"A. No, I didn't know what his interest was.

"Q. I say, you knew that he was going to take an interest in that?

"A. Why the only way you can put that—I knew he was helping to push the project to completion, and taking an active part in it, but what his interest was I didn't know.

"Q. Well, now, Mr. Hall, isn't it a fact that you knew that he was to have a part of the proceeds or profits, whatever there was?

"A. I don't know what this arrangement was in regard to the proceeds or anything about it.

"Q. You heard him talking with Mr. Kingsbury when they were up there, didn't you?

"A. Yes; he talked about different things, and about the investment and about the project being a good one.

"Q. Yes, and isn't it a fact now in your presence, while you were talking there, they figured up the probable gain or profits that could be made?

"A. I don't know as any stated amount. They spoke about it being a profitable proposition all of the time, which I thought it was."

Further as to the alleged concealment from the defendant of Wilson's commission, the sworn statement of G. F. Hall is found in this excerpt from his testimony:

"Q. Now, then, Mr. Hall, you knew that Mr. Wilson did not want Kingsbury to know, didn't you?

"A. Well, you might apply it in that way, but as for anything direct, why I would not know any more than

just naturally anybody would know about the transaction.

"Q. You did not expect him to get the information from Mr. Wilson, did you?

"A. Sure, I did. I supposed when he would ask Mr. Wilson, it would be up to Mr. Wilson to tell, because I had told him there would be a payment made.

"Q. You say there was never in the whole transaction any reason why you should not tell Mr. Kingsbury all about the commissions, was there?

"A. Why, I could have told him if I had felt disposed to, but I didn't feel disposed to tell any more than I did.

"Q. You now claim there was nothing in the whole transaction that would prevent you from disclosing it?

"A. Only impliedly.

"Q. Only impliedly—and that was implied through Mr. Wilson?

"A. Well, through the circumstances of the deal.

"Q. Through the circumstances of the deal? And you knew about that at the time the deal was made, didn't you?

"A. I knew that we had given Mr. Wilson a note for $3,000 to make this sale, and I had no occasion to go and tell Mr. Kingsbury or anybody else what we were giving. We had our price, and if Mr. Wilson sold at that price, and we were willing to pay him a commission, we considered that was our business and our privilege.

"Q. You impliedly knew at that time that Mr. Wilson did not want Mr. Kingsbury to know about the commissions, didn't you—I mean at the time you gave the note?

"A. Well, in an implied way, of course, I knew it."

It is beyond controversy that the plaintiffs constituted. Wilson their agent to find a purchaser for the land. They not only did this, but they also gave him the additional character of an optionee to purchase the same in his own right. It is also thoroughly es-

tablished that, assuming the latter guise and concealing the fact that he was in the pay of the opposite party, Wilson ingratiated himself into the confidence of Kingsbury, and as his coadjutor formed the corporation for the purpose of taking title to the land at the price of $36,000. Viewed in the most favorable light for the plaintiffs, however innocent may have been their intentions, they made it possible for him to assume either of two characters he might choose for the purpose of getting the defendant to purchase the land. In fact, he was acting as agent for both parties without the knowledge of the defendant. He dealt in gross violation of his duty to the latter by concealing from it that he was in the pay of the other party.

Hall's admission that he knew Wilson was helping Kingsbury to push the project to completion, and taking an active part in it, imputes to the plaintiffs knowledge that Wilson was at least acting as promoter of the corporation, and consequently, that he was in its confidence and in duty bound to act in good faith toward it. It makes no difference that according to Hall's claim he did not know what his interest was. He does not disclaim knowing that he had some interest. His own testimony is to the effect that he did know Wilson was a promoter of the defendant. The transaction was in fact tinctured with fraud as against the defendant. By clothing Wilson with the option as well as the employment to find a purchaser, the Halls equipped him for possible double dealing, and at least placed themselves in the position of one who by an innocent act makes it possible for another to deceive to his hurt a third party who is equally innocent. The law is unquestioned that in such cases the loss, if any, must fall upon the one who made such a result possible. This is the rule laid down in *Fiore* v. *Ladd,* 22 Or. 202 (29

Pac. 435); *Copeland* v. *Tweedle*, 61 Or. 303 (122 Pac. 302); *Banker's National Bank* v. *Western Union Cold Storage Co.*, 73 Ill. App. 410; *Stoney Creek* v. *Smalley*, 111 Mich. 321 (69 N. W. 722). Charged with the knowledge before the sale that Wilson was interested in promoting the project, and hence held the role of defendant's confidential agent, the plaintiffs are within the principle enunciated in *Kuntz* v. *Tonnele*, 80 N. J. Eq. 373 (84 Atl. 624). In that case the defendant having land for sale agreed with the plaintiff's agent sent to buy it to add a sum to the purchase price, which increase on payment by the plaintiff should be given to the agent. This was held to be fraudulent in both the representative and the defendant.

Again, the plaintiffs cannot accept the benefits of a transaction which is tinctured with the fraud of their own agent without suffering the consequent penalty of rescission at the election of the injured party: *Dresher* v. *Becker*, 88 Neb. 619 (130 N. W. 275).

2. The plaintiffs contend that the defendant was guilty of laches in not promptly disavowing the contract. The testimony convinces us, however, that although the president of the corporation instituted inquiries some months before renouncing the agreement, he was not able to discover anything definite enough to call for action until a very short time before the suit was commenced, when he demanded rescission as stated in his testimony. Mr. Justice WOLVERTON, in *Raymond* v. *Flavel*, 27 Or. 219 (40 Pac. 158), said:.

"The notice must be more than would excite the suspicion of a cautious and wary person; it must be so clear and undoubted, with respect to the existence of a prior right, as to make it fraudulent in him afterwards to take and hold the property."

Applied to the instant case, until the plaintiff G. F. Hall finally refused to beat about the bush further, and frankly admitted having paid $3,000 to Wilson, there was nothing more imputable to the defendant than mere suspicion which would not necessarily demand hostile measures on its part.

3. These considerations lead to the conclusion that the decree of the Circuit Court is reversed, and that the defendant is entitled to a rescission of the contract and a return of the money which it paid, together with a cancellation and return of its note and mortgage, so that, as far as possible, the parties may be restored to the condition in which they were at the inception of the transaction. Having had possession of the land, the defendant cannot recover interest on the cash invested. The decree here will be framed accordingly.

REVERSED. REHEARING DENIED.

MR. JUSTICE EAKIN and MR. JUSTICE BENSON did not sit.