Argued January 11, reversed January 30, rehearing denied February 13, motion to retax costs denied February 20, 1917.

## SOCIETY OF DOUKHOBORS *v.* HECKER.

### (162 Pac. 851.)

**Frauds, Statute of—Pleading—Complaint—Statute.**

1. In view of Section 804, L. O. L., requiring creation, transfer, etc., of an estate or interest in real property to be by an instrument in writing, a complaint seeking a rescission of contracts for the purchase of land and a return of the purchase price, alleging that a plaintiff corporation had verbally assigned its interest in and to certain land to the other plaintiffs, showed on its face that the individual plaintiffs acquired no interest in the land, and hence there is neither privity of estate nor of contract between individual plaintiffs and defendants sufficient to support a suit.

**Pleading—Complaint—Defect—Cure by Subsequent Proceedings.**

2. In an action seeking a rescission of contracts for the purchase of land and return of the purchase price in which the complaint showed on its face that there was no privity of estate or contract between individual plaintiffs and defendants and this defect was pointed out by the defendants at the outset, nothing in a subsequent proceeding cured it.

**Pleading—Conclusion of Law.**

3. In an action seeking a rescission of contracts for the purchase of land and return of the purchase price, allegations in the complaint that all representations made to the plaintiff corporation by the defendants were false, known by the defendants to be false, and made with the intent to induce the corporation to enter into the contract, were insufficient as a charge of fraud, since to allege merely that a quoted statement is false, without stating other matter showing wherein it is false, is to utter a conclusion of law which is bad on demurrer.

**Vendor and Purchaser—Fraud—Pleading—Sufficiency.**

4. In an action seeking a rescission of contracts for the purchase of land and return of the purchase price, an allegation that the defendants had agreed to give one of the plaintiffs a valuable consideration to induce him to persuade the plaintiff corporation to purchase the land was a sufficient averment of fraud, since the bribing

83 Or.—5

of the agent of one party to induce the execution of the contract will vitiate the same at the election of the party for whom the agent was originally employed to act.

**Fraud—Misrepresentation by Vendor—Quality or Value.**

5. Mere opinions of the excellence of real estate to be sold coming from the seller, unaccompanied by any statement of fact, do not constitute fraud.

**Vendor and Purchaser—Fraud of Vendor—Evidence—Sufficiency.**

6. In an action seeking a rescission of contracts for the purchase of land and return of the purchase price, evidence *held* insufficient to show that the defendants made fraudulent representations to the plaintiff corporation to induce the execution of the contract.

**Vendor and Purchaser—Fraud of Vendor—Evidence—Sufficiency.**

7. In an action seeking a rescission of contracts for the purchase of land and return of the purchase price, evidence *held* insufficient to show that defendants offered a bribe to one of the individual plaintiffs to induce the execution of the contract by the plaintiff corporation.

**Cancellation of Instruments—Rescission—Grounds.**

8. The fact that the plaintiff corporation made an improvident bargain when they contracted with defendants for the purchase of land does not present a situation which the court can relieve, as courts cannot make contracts nor break them except for some reason which the law recognizes which must be clearly proved by the complaining party.

[As to opinion on question of law by party to contract for sale of land as sufficient basis for charge of fraud, see note in Ann. Cas. 1913B, 1143.]

From Linn: WILLIAM GALLOWAY, Judge.

Department 1.   Statement by MR. JUSTICE BURNETT.

In the second amended complaint upon which this action was tried in the Circuit Court it is alleged that the plaintiff Society of Independent Doukhobors is a corporation duly organized under the laws of Oregon. There are 26 individual plaintiffs. The defendants are husband and wife. It is stated that on May 8, 1913, the defendants and the corporation entered into a written contract, whereby the latter agreed to buy and the former to sell to the corporation two tracts of land in Linn County, designated for convenience in this opinion as the "Hecker Place" and the "Irvin

Place," containing in all 1,000 acres, for $60,000, to be paid in prescribed installments, covenanting for possession of the premises to be given to the buyer on October 1, 1913; and that on October 13th of the same year the defendant B. J. Hecker further agreed with the corporation that, on payment of a stipulated part of the purchase price and the return of the contract of May 8th, he would make separate agreements with the individuals composing the corporation and their associates for distinct parcels of the 1,000 acres. As a charge of fraud inducing the execution of the contracts, the following excerpt from the complaint is here set down:

"That for the purpose of inducing the said corporation to make and enter into the said contracts, the said defendants made the following false and fraudulent statements, to wit: That the said land produces annually from 75 to 100 bushels of oats per acre, from 30 to 60 bushels of wheat per acre, and from 4 to 10 bushels of clover seed per acre, and from $40 to $60 worth of clover hay per acre. That an island of 90 acres in the river, being a part of said land, was a good and desirable place to build homes and a good place on which to live. That other and similar and adjacent lands was selling and had sold for the sum of from $75 to $100 per acre, and that none of said land was located in the river. That all of said statements were false, known by the said defendants to be false, and made with the intent to induce the said corporation to make and enter into the said contract; that the said corporation believed the said statements to be true and relied thereon, and in reliance thereon made and entered into the said contracts. That each of the other plaintiffs knew of the said statements, believed the same, and relied thereon, and in reliance thereon made the payments and improvements hereinafter described. That the island of 90 acres above described overflows every winter, and has so overflowed each

winter for many years last past, and that 45 acres of the said land is in the bed of the river.''

It is further averred by the plaintiffs that all of them except the corporation are Russians, and in order for them and the defendants to communicate with each other it was necessary to have an interpreter who understood both languages; that they employed M. F. Reibin to act in that capacity and paid him for his services as their agent; that by mutual consent of all the parties he acted as such interpreter in the negotiations, concerning which the complaint avers as follows:

''But in order to induce the said M. F. Reibin to advise and persuade these plaintiffs to purchase the tract of land described within the said Exhibit 'A' and to make and enter into the said contract, the said defendants fraudulently and conclusively promised and agreed to pay the said M. F. Reibin a valuable consideration, which fact was unknown to the plaintiffs. That on account of the said valuable consideration promised to him by the defendants, the said M. F. Reibin advised and induced these plaintiffs to make and enter into the said contract and make the payments hereinafter described.''

It is further stated: ''That after the signing of the said contract of which Exhibit 'A' hereto attached is a copy, the said corporation verbally assigned its interest in and to 940 acres of the said land to the other plaintiffs as follows''—setting out the acreage parceled to each, the amount paid by the several individuals, and the value of permanent improvements put upon the land by each of them.

They say that on November 28, 1914, they demanded of the defendants a rescission of the contracts, the return of the money which had been paid upon the purchase price, with interest, and compensation for the permanent improvements less the reasonable rental

value of the land.   A general demurrer to the original
complaint was overruled, and upon filing the second
amended complaint it was stipulated that the same ob-
jection should be taken as interposed to that pleading,
and that the court should be considered as having
overruled the same.   The answer denied the whole
complaint except as otherwise admitted.   It set out
that four of the plaintiffs, A. Popoff, W. Vereschagin,
W. Lapshinoff and M. F. Reibin entered into negotia-
tions with the defendant B. J. Hecker for the purchase
of the land described in the contracts, made personal
examination of the same, and, having fully satisfied
themselves as to its character and value, organized the
corporate plaintiff with which defendants contracted
executing for that purpose Exhibit "A" made part of
the plaintiffs' amended complaint; that the defendant
Ada Hecker took no part in any of the negotiations
and signed the first contract solely to bind her inchoate
right of dower as the wife of B. J. Hecker; that the
corporation entered into possession of land immedi-
ately after the execution of the contract; and that the
defendants had no knowledge of the terms of any
agreement between the plaintiff corporation and the
individual plaintiffs.   Other defenses are averred
which are unnecessary to consider.   The reply trav-
erses the new matter of the answer.

The original complaint contains a charge of fraud.
The alleged false statement concerning the land is as
follows:

"That for a number of years last past the said land
had produced oats of the value of $15 per acre and up-
ward; that an island of 90 acres in the river, being a
part of said land, was a good and desirable place to
build homes and a good place on which to live; that
other similar and adjacent lands was selling and had

sold for the sum of from $75 to $100 per acre; and that none of said land was located in the river.''

The second amended complaint was filed at the trial, the only change being to substitute for the language last above quoted from the original complaint the statement:

''That the said land produces annually from 75 to 100 bushels of oats per acre, from 30 to 60 bushels of wheat per acre, and from 4 to 10 bushels of clover seed per acre, and from $40 to $60 worth of clover hay per acre.''

After a hearing, the court passed a decree canceling the contracts, giving a personal judgment against both defendants for the payments made, with interest from their dates at 6 per cent, and the further sum of $2,000 as the cost of improvements above the rental value of the land, adjudging all these amounts to be a lien upon the land and directing it to be sold for the satisfaction thereof. The defendants appeal.

REVERSED. BILL DISMISSED. REHEARING DENIED.
MOTION TO RETAX COSTS DENIED.

For appellants there was a brief over the names of *Messrs. Hill & Marks* and *Messrs. Hewitt & Sox,* with oral arguments by *Mr. Gale S. Hill* and *Mr. Carlton E. Sox.*

For respondents there was a brief and an oral argument by *Mr. H. E. Slattery.*

MR. JUSTICE BURNETT delivered the opinion of the court.

1. The first thing to consider is the sufficiency of the complaint. As to the individual plaintiffs, it will be remembered that the contract was made with the

corporate plaintiff. The testimony is that the defendant B. J. Hecker expressly refused to deal separately with a number of individuals, which was the reason for organizing the corporation. It is alleged that, after the execution of the contract, the corporation "verbally assigned its interest in and to 940 acres of the said land to the other plaintiffs." It is stated in Section 804, L. O. L., that:

"No estate or interest in real property, other than a lease for a term not exceeding one year, nor any trust or power concerning such property, can be created, transferred, or declared otherwise than by operation of law, or by a conveyance or other instrument in writing, subscribed by the party creating, transferring, or declaring the same, or by his lawful agent, under written authority, and executed with such formalities as are required by law."

2. On the face of the complaint, therefore, it appears that the individual plaintiffs acquired no interest in the land. It is not pretended that the agreement in question was itself assigned either in whole or in part; hence there is neither privity of estate nor of contract between the individual plaintiffs and any of the defendants sufficient to support any cause of suit by either against the others. This defect was pointed out by the defendants at the outset, and nothing in the subsequent proceedings has cured it. It is fatal to the complaint so far as the individuals are concerned.

3. As to the corporate plaintiff, it is stated that all the representations were false, known by the defendants to be false, and made with the intent to induce the corporation to enter into the contract. This is clearly insufficient as a charge of fraud. The law is that the statements relied upon as fraudulent must be averred, and other matter must be stated showing wherein they are false. In other words, the false and

.the true must be contrasted in the pleading so that the court may be enabled to draw the same conclusion from the premises that the pleader does. To allege merely that a quoted statement is false is to utter a conclusion of law which is bad ·on demurrer: *Specht* v. *Allen,* 12 Or. 117 (6 Pac. 494); *Misner* v. *Knapp,* 13 Or. 140 (9 Pac. 65, 57 Am. Rep. 6); *Leasure* v. *For-quer,* 27 Or. 334 (41 Pac. 665); *Leavenwood* v. *McGee,* 50 Or. 233 (91 Pac. 453); *McMillan* v. *Batten,* 52 Or. 218 (96 Pac. 675); *Cooper* v. *Hillsboro Garden Tracts,* 78 Or. 74 (152 Pac. 488); *Ingram* v. *Carlton Lumber Co.,* 77 Or. 633 (152 Pac. 256).

4. The suit might well be dismissed at this point, but for the charge in the complaint that the defendants agreed to give the plaintiff Reibin a valuable consideration to induce him to advise and persuade the promoters of the plaintiff corporation to purchase the land. It is settled that without the consent or knowledge of both the contracting parties no one can act as agent for both of them, and that the bribing of the agent of one to induce the execution of a contract will vitiate the same at the election of the party for whom the agent was originally employed to act: *Johnson* v. *Sheridan Lumber Co.,* 51 Or. 35 (93 Pac. 470); *Hall* v. *Catherine Creek Development Co.,* 78 Or. 585 (153 Pac. 97, L. R. A. 1916C, 996). The allegation of the complaint in this respect, therefore, requires treatment on the merits, and for the sake of clarity the other averments about fraud will be considered in like manner.

As to the quality of the land, the evidence plainly shows that, of the four Russians who conducted the negotiations, three of them were experienced farmers both in Russia and in Canada, and that the plaintiff Reibin, although not at that time engaged in that voca-

tion, had been brought up on a farm and was familiar with such things. There is no testimony whatever to support the assertion that Hecker told them the island was a good place to live, and it is undisputed that Hecker pointed out all the boundary lines, and, more than that, afterward agreed to a proportional reduction in the price to cover what land was in the bed of the river. It also appears that the four visited the land in question on two different occasions and were shown all over it and given ample opportunity to inspect the premises, the quality of the soil, and its products. The examination took place in the latter part of April and the fore part of May, when conditions were as favorable as at any time of the year to determine the quality of the land. They made independent investigations upon which they relied within the meaning of *Wimer* v. *Smith,* 22 Or. 469 (30 Pac. 416). Moreover, the allegation that the defendants represented that the ''said land produces annually from 75 to 100 bushels of oats per acre,'' etc., is not supported by the evidence. W. J. Vereschagin, one of the quartet, testified through an interpreter that he could not understand the English language when he saw the land, but that the plaintiff Reibin acted as interpreter between them and Hecker, in pursuance of which, as the witness states, ''Reibin said that the land is very good and it would produce anything, everything.'' Asked to state what Reibin said the land would produce, the witness answered:

''Of oats, wheat, clover, hay; general kind of hay.
''Q. How much oats per acre did he say?
''A. From 40 to about 80 or 100 bushels of oats.
''Q. How much wheat?
''A. Wheat, from 20 to 50.
''Q. Clover?
''A. From 4 to 10 bushels of clover.''

Recounting the interpretation of Reibin between Hecker and the four Russians, the following testimony came from the lips of W. Lapshinoff:

"Then what did Reibin tell you that Hecker said?

"A. He says, 'He praised the land.'

"Q. I know, but did he use the word; what did he say?

"A. He said that the land is very good; it will bring, it will produce anything, everything.

"Q. How much of anything, and what did he say it would produce?

"A. Of oats, from 40 to 75 and more per acre, bushels per acre.

"Q. How much wheat?

"A. Wheat, about— * * He said that he stated that 'you shall have to pay out for the land from produce,' and he says that the land produces from 40 to 75 bushels per acre and more of oats, and from 20 to 60 bushels of wheat per acre; and clover, from 4 to 10 bushels of seed, clover seed, per acre; wheat, from about 3 tons and up per acre."

Reibin, one of the English-speaking Russians who claims to have acted as interpreter, testified thus:

"Well, Mr. Hecker, he told us out there that that land would produce from 40 to 100 bushels of oats to the acre, and from 20 to 50 bushels of wheat, and from 4 to 10 bushels of clover. In fact, he told us the land would pay for itself in the course of two or three years.

"Q. Well, the point is, did you tell these other three Russians that he said that to you?

"A. I told them at the very moment that Mr. Hecker told me.

"Q. Now, what did you tell them?

"A. I told them that Mr. Hecker says that this land is able to produce from 40 to 100 bushels an acre of oats, from 20 to 50 bushels of wheat, and from 4 to 10 bushels of clover."

He said these representations were made the second time they inspected the land. He reiterated on cross-examination that the statement of Hecker was that "the land would be capable to produce" the amount of grain mentioned. He also said that Hecker told him the Irvin Place had been used as a stock ranch and had not been in cultivation for many years, and the witnesses for the plaintiffs agreed that this was manifest from an inspection of the ground itself.

5. It is well settled that mere opinions of the excellence of the property to be sold coming from the seller, unaccompanied with any statement of fact, do not constitute fraud. They are set down in the same category with expressions in advertisements praising goods to be sold for their excellent qualities. *Black* v. *Irvin,* 76 Or. 561 (149 Pac. 540); *Hegdale* v. *Wade,* 78 Or. 349 (153 Pac. 107), are among the most recent utterances of this court on that subject.

6. Furthermore, even if this opinion praising the qualities of the soil should be taken as a declaration of a fact, the only evidence disputing the same is that the other plaintiffs who cropped it failed to raise as much wheat and oats per acre as the complaint alleges the defendant said it produced. They gave us no information about the manner in which they farmed the land, and it does not follow as a matter either of fact or of law that the ground was incapable of producing the amount of grain represented because they failed to make as good a crop. Good husbandry, climatic conditions, excellence of seed and cultivation are all factors entering into the production of a crop, and what land will produce is clearly a matter of opinion to which one man has a right as well as another, and they cannot be set down as representations of fact when taken alone. Moreover, it is a matter of note-

worthy importance that, although the representations were made in April and May, 1913, it was not until the cause was brought on for trial on April 26, 1915, that they changed their allegation from the value of the crops raised to the quantity. It is without dispute that plaintiffs were entitled to amend their complaint, but it affects the value of their evidence when they do not think of putting in the quantity instead of the value until the last minute before trial. The defendant Hecker and his business partner, Beam, who was present at the time of the negotiations and inspection of the place, both deny that even the statement imputed to Hecker was made. The clear weight of the testimony is in favor of the proposition that no fraud in that respect has been shown.

It remains to consider the allegation about the defendant having offered the plaintiff Reibin a consideration to induce his associates to buy the land. The testimony shows that, after the four promoters of the corporate plaintiff had inspected the premises the first time, they went to Eugene, to Cottage Grove, and to Roseburg, where they looked at other lands. From the latter place the plaintiff Reibin addressed a letter to Hecker as follows:

"Roseburg, Oregon, April 30, 1913.
"Barney Hecker, Esq., Albany, Oregon—
"Dear Mr. Hecker: Although our boys have some very good offers around here and Cottage Grove and Eugene, I induced them to take your piece of land, and I have no doubt that I will succeed to bring them over to you and close the deal very probably right now. Naturally I expect from you a favor in return for this service. But this must be kept private from the boys.
"Please let me know by first mail to Osborne Hotel, Eugene, Oregon, on what I can depend.
"Yours truly,
"M. F. REIBIN."

Hecker answered from Portland with this letter:

"Portland, Oregon, May 2, 1913.
"Mr. M. F. Reibin, Osborne Hotel, Eugene, Oregon—

"My Dear Mr. Reibin: Yours of April 30th just received. As I am in Portland at present will account for delay of answer. In regard to what you want out of the deal in case of sale of place to your people, I made them a much better price than I ever offered it for to anyone else and have made them a very close price, as you know and I figure that you appreciate as of course you are interested in them getting a good 'deal for them and would be very glad to work with you in any future deals that any other of your people would want, where I could get you a very liberal commission. And as for the present deal, I will be very glad to do all I can for you—and am sure you will be satisfied. This will be kept confidential by me—and will arrange satisfactory terms when I see you. I may be in Portland for several days or until the first of next week. But if you are coming to Albany I wish you would send me a telegram and I will come to Albany so you will not have to wait; if you wire send telegram to 68 Grand Avenue, Portland, Oregon.

"Yours truly,
"Barney Hecker."

Reibin is clear in his testimony that these are the only writings or communications which passed between himself and Hecker prior to the execution of the contract. Reibin says that the letter from Hecker was the only promise the latter ever made. The former says that, after the contract was made and after they had given Hecker $600 on account of the land:

"We were driving in the car, and I told him about it. He told me, 'Of course,' he said, 'that is a small amount; it amounts to nothing. When I have a substantial payment made on this land, the first full payment on this land, then I will see my way clear to make some arrangements with you about this commission.'

"Q. But there was no definite agreement about what he was to pay you?

"A. No, he didn't say any sum or amount.

"Q. That talk, now, that you are telling about, that happened after this contract was entered into?

"A. Yes.

"Q. And after you had made the first payment?

"A. Yes.

"Q. But prior to that, the only thing, either in words or writing, or anything that passed between you and Mr. Hecker about this thing, was these two letters, Plaintiffs' Exhibits 1 and 2?

"A. Well, I believe I mentioned once before; when I came, I told Mr. Hecker, 'Now, I have brought the boys up here, and I think we can close the deal now. Of course,' I told him—,

"Q. (Interrupting.) You told him you would close the deal?

"A. Will close the deal; and I told him that I would like an understanding that I was to receive a commission.

"Q. When was that?

"A. Oh, that was when we first met him, when he came back from Portland.

"Q. When he came back from Portland?

"A. Yes.

"Q. What did he say?

"A. Oh, he said it was all right. 'I will take you all on the ranch; I will show the boys around; if you can close the deal right now, that would be all right.' "

The only thing savoring of a money transaction or other gratuity in this connection occurred October 13, 1913, when Reibin returned from Canada for the purpose of making a payment upon the land. His own testimony is here set down:

"Q. And didn't you claim to Mr. Hecker that you were out a hundred dollars expenses, and that the people up there wouldn't allow you anything, and you asked him to allow you a hundred dollars on your expenses?

"A. I told Mr. Hecker that I needed a hundred dollars, that I need a hundred dollars, and that I wanted him to give me eleven hundred dollars receipt, and that I will give him the draft for a thousand dollars, and he said that was all right. Of course, it was understood that this hundred dollars was on account of commission.

"Q. And was anything said about it being on account of commission?

"A. Yes.

"Q. Who said that?

"A. I told him that.

"Q. Didn't you claim that you wanted that for your expenses coming down there? Didn't you?

"A. Well, I told him that I made expense out of my own money for coming down; that I wanted that hundred dollars to cover it; but it was, he was giving me that eleven hundred dollars receipt with the understanding that that hundred dollars would be deducted out of my commission.

"Q. Out of your commission?

"A. Yes.

"Q. Now, isn't it a matter of fact that you claimed this hundred dollars for your expenses?

"A. Well, how will I spend this hundred dollars?

"Q. And that you only gave him a thousand dollars?

"A. I gave him a thousand dollars.

"Q. You gave him a thousand dollars?

"A. Yes.

"Q. And didn't he credit the corporation on his books with eleven hundred dollars?

"A. He did.

"Q. And isn't this hundred dollars which you now try to claim as a commission a part of the total payments which you are trying to charge off against Hecker in this transaction?

"A. It was credited to me as commission.

"Q. In other words, in one breath you are claiming that as a commission, and the plaintiffs are coming in here, on the other hand, trying to claim that that is a credit on what they paid Hecker; isn't that right?

"A. What?

"Q. This hundred dollars, isn't that the total named in the figures?

"A. Yes."

The plaintiffs introduced in evidence the receipt accompanying this payment, as follows:

"Albany, Oregon, October 13, 1913.

"Received of M. F. Reibin for the Society of Independent Doukhobors the sum of eleven hundred and no/100 dollars as payment on land.

"Signed—B. J. Hecker."

Hecker utterly denies agreeing to give Reibin any commission, but says in substance that he promised him that if in the future he should bring a purchaser to him he would allow him a commission. He explains the $1,100 transaction to the effect that Reibin claimed that he was under considerable expense coming from Canada to Oregon and was without money, and asked for a receipt to be applied on the purchase price for an extra $100 which he allowed and credited to the corporation. It is also noteworthy that the plaintiffs count the full amount of $1,100 named in the receipt as part payment on the purchase price, and it is necessary to include that in order to make up the sum they claim was paid by them toward the discharge of the obligation. It is very plain that Reibin had his hand out for a bribe. It is also manifest that Hecker dallied with him without committing himself fearing that the bargain would be spoiled. This is the only fair construction to be placed on the correspondence between the two men. Pressed on the point, Reibin himself admits that nothing definite was ever promised to him. The writings executed at the time are the best evidence of what occurred about the $100, and that is a receipt to the purchasing corporation for $1,100

when it only paid $1,000. If Reibin has embezzled $100 of the funds of his corporation, it cannot be laid at the door of Hecker.

The general doctrine on this subject is as stated in the cases cited above. Speaking, however, on this subject we find this in 2 C. J. 714:

"The above rules as to good faith and loyalty do not apply after the agency has been fully terminated. As a general rule, after one has performed his office as agent or has in good faith severed his relation as agent, he is free to take up negotiations for his own interest, and can act adversely to his former principal as fully as any other person."

Again on page 765:

"After the transaction for which the agent was employed has been closed, however, and the agency has terminated, the agent does not forfeit his right to compensation from his principal by representing the adverse party or by accepting compensation from him."

Even if the $100 was paid as commission to Reibin for having previously secured the execution of the contract, yet it was admittedly paid after the interpreting for which he was employed had been fully consummated, and it was not in pursuance of any previous arrangement, for the letters cannot be tortured into an agreement to pay.

7, 8. On the merits, none of the charges of fraud have been established by anything like a preponderance of the testimony. From that viewpoint, as well as upon the law, the bill should be dismissed as to the individual plaintiffs. On the law as to the sufficiency of the complaint the bill ought to be dismissed as to the corporate plaintiff except for the allegation that the defendant had offered a bribe to Reibin. On that the testimony is insufficient to establish the charge as a matter of fact; and, moreover, it appears that, if

anything was done in that way, it was long after the agency had terminated and could not possibly have influenced Reibin in the least. The decided preponderance of the evidence is that, at the time the trade was made, the market value of the Hecker Place was $100 per acre, and of the Irvin Place $60 per acre, but that since then realty values have shrunk in a marked degree. All things considered, the corporation may have made an improvident bargain which it has attempted to lay upon the shoulders of the other plaintiffs, but this does not present a situation which the court can relieve. Courts cannot make contracts, neither can they break them except for some reason which the law recognizes, as fraud or the like, which must be clearly proved by the complaining party. In this instance the plaintiffs have failed on this point.

The result is that the decree must be reversed and the bill dismissed.     REVERSED. BILL DISMISSED.

REHEARING DENIED.

MOTION TO RETAX COSTS DENIED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BEAN and MR. JUSTICE BENSON concur.