170 N.J. Super. 334 (1979)
406 A.2d 474
JACLYN, INC., BONNIE INTERNATIONAL, AND EMPRESS HANDBAG COMPANY, INC., PLAINTIFFS,
v.
EDISON BROTHERS STORES, INC., DEFENDANT-COUNTERCLAIMANT,
v.
ABE GINSBURG, HOWARD GINSBURG, AND ALEX CHESTNOV, ADDITIONAL DEFENDANTS ON THE COUNTERCLAIM.
Superior Court of New Jersey, Law Division.
Decided June 29, 1979.
*338 Messrs. Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan for plaintiffs and additional defendants on the counterclaim (Mr. Matthew P. Boylan, appearing).
Messrs. Hellring, Lindeman, Goldstein & Siegel for defendant-counterclaimant (Mr. Jonathan L. Goldstein appearing, Mr. Richard K. Coplon, of counsel).
YOUNG, J.S.C.
The defense of commercial bribery interposed by Edison Brothers Stores, Inc., defendant-counterclaimant, to a claim of $436,000 for goods sold and delivered by Jaclyn, Inc., and its subsidiaries, plaintiffs, presents issues not previously decided in our civil reports. Defendant counterclaims against plaintiff corporations and the principals of Jaclyn for damages.
Jaclyn, Inc., together with its subsidiaries, Bonnie International and Empress Handbag Co., Inc., hereinafter collectively referred to as Jaclyn, a leading manufacturer of handbags, maintains offices and a factory in West New York, N.J. Edison Brothers Stores, Inc. (Edison) owns a chain of 650 shoe stores *339 trading as Chandler's, Leed's, John Bari and Baker's. The parties stipulated that handbags were sold and delivered by Jaclyn to Edison between February and July 1976 at an invoiced price of $436,284.32.
The record, consisting of numerous exhibits, transcripts of depositions and trial testimony has been collated into five segments of proof.

The Role of Joseph Fingerhut
The business dealings between the parties may be divided into two chronological periods, pre-January 1975 and thereafter. Prior to 1975 Jaclyn and its subsidiaries sold to Edison relative modest quantities of merchandise, in dollar value $25,000 during 1972, $170,590 in 1973 and $125,800 in 1974. Edison points to a private meeting on January 10, 1975 at the Tuscany Hotel in New York City at which a "secret deal" was struck under the terms of which Jaclyn, through Abe Ginsburg, its president, promised covert compensation to Joseph Fingerhut, Edison's senior buyer, in exchange for placing orders. Edison relies upon the profile of purchases made during the ensuing 17 months, upon asserted declarations against penal interest by Fingerhut, and upon an analysis of Fingerhut's financial status following his discharge by Edison on May 10, 1976 to establish commercial bribery.
Following the initial meeting there was a sudden and conspicuous surge in purchases, which totaled $1,229,021 for 1975. The decision-making authority for placing orders assumed one of the central issues of the trial as between Fingerhut and the head of his division, Herbert Talcoff, vice-president and director of accessories of Edison. The court finds that although Fingerhut was responsible for placing many, if not most, of the orders, another buyer and associate buyers also placed orders. Moreover, the controlling judgment reposed in Talcoff, who monitored his buyers by a refined system of statistical controls and by weekly and bi-weekly conferences.
*340 The increased volume of sales is attributable to a new manufacturing process  flo-molding  developed exclusively by Jaclyn in 1974. That technique enabled Jaclyn to produce facsimiles of leather handbags at a competitively low cost. The popularity of Jaclyn's entire flo-molded line exerted irresistible economic pressures upon Edison such that it would have paid the maximum asking price.
In December 1975 Talcoff received the first of several reports that Jaclyn was making kick-backs to Edison's buyers. Ed Rosen, associate buyer, reported that he had received four bank checks of $25 value each with a Christmas card from Kenneth Orr of Empress Handbag. In early January 1975 Rosen reported that Howard Ginsburg, son of Jaclyn's president, gave him $500 in cash. Talcoff promptly relayed these reports to Julian Edison, to whom it was also reported that Jaclyn paid Joe Fingerhut $25,000 recently.[1] Additional inculpatory information was received by Talcoff in the same month that Olla Industries, another handbag manufacturer, had paid sums to Fingerhut and that currently a scheme was set up whereby money was being "laundered" through Fingerhut's son. Confirmatory evidence of the kick-backs took the form of a cancelled check which was passed on to Julian Edison, who decided not to confront his buyer with evidence of his disloyalty because "he wanted to get more information about the activities of our buyers." At the trial Julian Edison, as well as Eric Newman, Edison's legal counsel and executive vice-president, acknowledged that they had received reports of payments to their buyers which they considered to amount to "attempted bribery."
The highest officers of Edison formed a committee to investigate, and engaged outside counsel, Herbert Robinson, of New York City. On May 10, 1976 Fingerhut was summoned to an *341 interview. Julian Edison testified that after persistent denials from Fingerhut, he was terminated. At that point in the interview the senior buyer acknowledged that he had received cash payments from several vendors, including "occasional $600" in cash from Jaclyn, as well as payments from other vendors. The court viewed a videotape of Fingerhut's deposition during which the senior buyer admitted only to have received "gifts." He did not recall having made the admissions during the interview in May 1976. Fingerhut's deposition was frustrated at every turn by the witness and his private counsel, from which this court draws the broadest adverse inferences.
An analysis of Fingerhut's bank and tax records disclosed that $35,415.91 was deposited in Fingerhut's personal and family accounts in the Mercantile Trust Company, N.A., St. Louis, between January 1975 and May 1976. On May 11, 1976 a search of Fingerhut's safe deposit box disclosed $35,000 in cash. At the trial Eric Newman qualified as an expert on the circulation of money and was permitted to express the opinion that 74.72% of the currency, stored in three envelopes bearing the name of the Tuscany Hotel, New York City, issued out of and was in circulation in New York. This evidence supports the inference that Fingerhut received a substantial portion of the $35,000 while he was in New York City where Jaclyn was the main resource of his company.[2]
This court finds that Jaclyn made payments of cash to Joseph Fingerhut during the months following the resumption of business relationships in January 1975 and that those payments were intended to influence the buying decisions of Edison's purchasing agent in favor of Jaclyn. This finding is supported by Fingerhut's admission of having received an "occasional $500 or $600," his earlier connotation of a bribe ascribed to payments of that size if received from a vendor, and by the large sums of *342 unaccounted-for cash found in envelopes of the Tuscany Hotel in Fingerhut's safe deposit box.
This court also finds that Edison acquired reliable knowledge early in January 1976 of Jaclyn's practice of making pay-offs to purchasing agents. Lastly, the court finds that Edison was acutely aware of the steady surge in purchase orders placed by the "Fingerhut Group" of its buying staff, notwithstanding a slump in the market for Jaclyn's products as reflected in its statistical tools. Before describing the steps taken by Edison following Fingerhut's termination in May 1976, three other segments of proofs will be summarized.

Payments to Edward Rosen
The remaining three segments of proof require a prefatory description of the economic setting in the latter months of 1975 as viewed by Edison. The popularity of the "Gulf Stream" and "Windjammer" handbag models, introduced in 1974, began to wane. Edison's profit margins dropped from an average of 54% to approximately 42%. Edison suggests that these developments confirm its allegation that Jaclyn resorted to the payment of "gifts" to buyers in order to "perpetuate" the initial success of its flo-molded products, and points to two incidents testified to by Edward Rosen, an associate buyer. At Christmas 1975 he received by mail in St. Louis from Kenneth Orr, vice-president of sales of Empress Handbag, four bank checks of $25 each. Orr testified that the checks represented a token of appreciation for expediting the orders placed during the past year, not in expectation of future orders. Orr admitted, however, that he sent the gift certificates to buyers' homes so that their employers would not learn of them, well aware of the formal policy of many companies which enjoined the receipt of such gifts.
Rosen viewed the checks as a bribe, although he asked his superior, Talcoff, whether or not he should send them back or *343 keep them.[3] On a trip to New York Rosen returned the checks without any reference to Edison's policy against the practice, a policy promulgated in 1957 and republished among Edison's vendors as late as November 1975.
A second incident occurred when Rosen came to New York on January 11, 1976 and had dinner with Howard Ginsburg, vice-president and son of Jaclyn's chief executive. Midway through the dinner Howard Ginsburg passed an envelope to Rosen with the words, "Better late than never," and described the contents as "Just a little token." The envelope contained ten $50 bills. When Rosen returned the envelope upon instructions from his superior, Howard is quoted as having said, "My father's going to kill me." At the trial, Howard Ginsburg recalled the dinner meeting with Rosen, but denied that he had passed any money, branding the statement about his father's anticipated ire as a lie.
Both incidents were contemporaneously reported to the president of Edison Brothers.
This court finds that the events of the dinner meeting and its sequel between Rosen and Howard Ginsburg did take place as related by Rosen. The court also finds that the episodes of Orr and Ginsburg were reported to the highest echelons of Edison Brothers in January 1976. The court also concludes that Eric Newman considered the payments in both instances to amount to "attempted bribery." The evidence also confirms that neither *344 Rosen nor other associate buyers were given any "precautionary steps," as he phrased it, with respect to trading in the future with Jaclyn or its subsidiaries. On the contrary, after the January 1976 visit to New York Rosen and Henry Winer placed orders with Jaclyn during their buying trip in March.
It is the determination of this court that the so-called "transactions" of Kenneth Orr and Howard Ginsburg did not induce Rosen to place orders with Jaclyn because Rosen testified that Jaclyn's merchandise were staple items that filled the need of Edison's stores. However, the two incidents of payments to Rosen refute Jaclyn's assertion that payments, whether denominated "gifts" or other, never exceeded $25 in value. The court determines that the payments were designed to influence Rosen in his dealings with Jaclyn, although that design was frustrated by the intervention of Talcoff.

Jaclyn's Relations with Non-Edison Buyers
Edison submitted evidence of gifts to three non-Edison employees. Gordon English, buyer for Bradlees of the Stop & Shop Companies, was deposed in Massachusetts. Documentary evidence established that English redeemed 18 Macy's gift certificates of a total value of $700, of which $200 came from Jaclyn during December 1975-January 1976. English said the gifts were accompanied by a Christmas card, and that such gifts never affected his decision to place orders.
Nellie M. Thomas, buyer for Kuhn's Big K Stores, admitted that every year since 1971 she received gifts or gift certificates from Jaclyn but not in exchange for an order. Documentary evidence established that Mrs. Thomas redeemed gift certificates from Macy's in March 1976 in the total value of $1,200, of which Jaclyn was one of some 250 vendors; she would be "surprised," she testified, if Jaclyn's gift exceeded $100.
*345 Dollie Mae Huffman, buyer for 359 stores of G.C. Murphy Co., McKeesport, Pa., admitted to the receipt of gift certificates from Jaclyn "of various denominations over the years," going back 20 years. The gifts, "anywhere from $50 to $100" in value, were usually accompanied by a Christmas card. When confronted with a Macy's Gift Bond Redemption Form, Mrs. Huffman admitted that at Christmas 1975 she received gift certificates valued at $500 from Jaclyn which she ascribed to her impending retirement that did not occur until May 1978.
Ed Breitbart, sales manager of Jaclyn and Bonnie International, denied the gift to Mrs. Huffman of $500, but allowed that he "may have" given to Mrs. Thomas gift certificates of a value of $225. "It was not a bribe. There was an occasion, I'm positive of that," Breitbart insisted. Breitbart provided insight into the magnitude of the practice in the industry, stating that Jaclyn could not forego giving gifts "when everybody else does," to maintain market position and good will.
It is the finding of this court that Jaclyn followed a pattern over the years of giving gift certificates to non-Edison buyers, the value of which far exceeded the $25 limitation reiterated by its principals in pretrial discovery. The court also concludes that the motivation of Jaclyn's policy was to foster business relationships with the recipients of its generosity.

Jaclyn's Methods of Generating Cash
Edison pointed to four possible sources from which Jaclyn allegedly generated unexplained and unaccounted-for cash which would be available for "payoffs." Edison submitted numerous exhibits of cancelled checks issued by Jaclyn which were used to purchase gift certificates from Macy's, Bloomingdale's, Altman's, Sak's and Schlesinger's in a total amount of $20,100 in 1974 and $30,500 in 1976. The volume of purchases and the policy of Macy's to redeem its certificates for cash are *346 urged upon the court to support the inference that Jaclyn used covert means to accelerate its sales volume.
It was also established that Jaclyn maintained two retail outlet stores in North Hudson from which distressed merchandise was sold. The transactions of those stores were not attended by internal controls; the amount of cash so generated was not disclosed.
On another occasion Alex Chestnov held 24 cashier's checks of $25 denomination, plus four checks returned by Orr and intended for Ed Rosen. Chestnov said he endorsed Rosen's name to the four checks as well as fictitious names on the other instruments and placed the proceeds of $700 in his desk drawer to be used for "expenses."
Jaclyn's financial records were audited by Israel M. Pogash, C.P.A., who offered his opinion that a series of checks made out to cash, totalling $2,800 over a two-year period, would not arouse suspicion in the context of a company doing $40 million annual business in 1975. The accountant concluded that his audit did not show any pattern that Jaclyn was accumulating a fund intended to be used for "pay-offs."
The court finds that the evidence here collated, viewed in the context of the controversy as a whole, is of insufficient weight to establish the contention that Jaclyn generated a cash fund intended for the bribery of buyers of its merchandise. This finding is made giving full effect to the role of circumstantial evidence in establishing the defense of commercial bribery.

Relations Following May 10, 1976
Following Fingerhut's discharge on May 10, 1976 Edison adopted a "clearance policy" under which no invoices would be paid or normal business resumed until the vendor "told the truth" about payments to Edison's buyers. Eric Newman, executive vice-president, and Herbert Robinson, special New York *347 counsel, comprised the "clearance committee." That policy was conveyed to Jaclyn during a visit by Robinson on May 27, 1976. On June 3, 1976 Howard Ginsburg went to St. Louis at the invitation of Newman to discuss "clearance," but reiterated that no written admissions of wrongdoing would be forthcoming.
In the meantime Jaclyn's auditors, Touche, Ross & Co., were pressing Edison for payment of $216,875.51 allegedly due as of May 30, 1976. Newman replied, inviting their cooperation in the investigation of the reports of "improper payments." Between late June and October when suit was filed, the record reflects maneuvering on the part of both parties, Jaclyn seeking to extricate itself from the checkmate and Edison exploring a strategy which would both satisfy its declared policy and, at the same time, insure the delivery of needed merchandise. Just as powerful economic forces kindled the resumption of business between the parties in January 1975, so equally compelling economic forces continued to motivate Edison, notwithstanding its knowledge of "attempted bribery" of its associate buyer and of payments to its senior buyer.
On July 20 the first of 22 shipments was released to Edison, which it retained and retailed throughout its stores. That merchandise had a value of $173,016.20 and forms a substantial part of plaintiffs' claims. Edison's argument that the handbags were shipped by design of Jaclyn deliberately to increase the dollar value of its claim in contemplation of litigation is not supported by the record. At a meeting between Newman and Abe Ginsburg on August 26 in New York, Ginsburg reiterated the general denials of payments to Edison's agents. By letter of September 10 Eric Newman wrote to Jaclyn's auditors, Touche, Ross & Co., suggesting a partial payment as an inducement to get some cooperation with its investigation of kick-backs. The pending suit was filed October 6, 1976.
This court finds that although Edison was endowed after May 10, 1976 with the maximum amount of knowledge of payments *348 to its senior buyer by Jaclyn, Edison used its legal defenses as a form of barter in exchange for delivery on a score of purchase orders. Edison pursued such a policy fully aware that the defense of commercial bribery may not be waived, and as a consequence sought to obtain delivery of the embargoed merchandise, which it accepted and retailed. At the same time Edison reserved its defenses against what would then amount to a claim enhanced by almost $200,000 in goods sold and delivered. The court also finds that the transcendant consideration which motivated Edison's policy towards Jaclyn both prior to and after May 10, 1976 was its economic needs for merchandise of unique manufacture proprietary to Jaclyn.

The Law
A threshold issue briefed by the parties concerns the choice of law between New York and New Jersey. The validity of a contract is to be determined by the law of the place of contracting. Colozzi v. Bevko, Inc., 17 N.J. 194, 202 (1955); Naylor v. Conroy, 46 N.J. Super. 387, 391 (App.Div. 1957). The cause of action sued upon is related to the contacts with this State. The evidence establishes that orders were placed by Edison via telephone and mail to Jaclyn's office in West New York, N.J., the handbags were manufactured and shipped from Jaclyn's plant in that town, and the invoices and payments were handled at that location. The singular point of contact with New York arises from the location of Jaclyn's showroom on Fifth Avenue in Manhattan. The transactions in New Jersey were continuous and systematic, during which defendant must have contemplated performance in this State. See Corporate Develop. Spec., Inc. v. Warren-Teed Pharm., Inc., 102 N.J. Super. 143, 149-50 (App.Div. 1968). The law governing the case is that of New Jersey.
The substantive law relating to civil and criminal actions which allege commercial bribery finds its origins in the common *349 law. The common law recognized that the misconduct of an agent by concealment or neglect of duty entitled the principal to the equitable remedy of rescission. See Young v. Hughes, 32 N.J. Eq. 372 (E. & A. 1880). Thus, an agreement between a seller and an agent for a buyer whereby an increase in the purchase price was to go to the agent unbeknownst to the buyer, amounted to fraud. Kuntz v. Tonnele, 80 N.J. Eq. 373 (Ch. 1912). The buyer had a right of action against both his agent as well as against the seller.
The provisions of the Crimes Act (L. 1908, p. 587), the predecessor of what has come to be referred to as the New Jersey commercial bribery statute, N.J.S.A. 2A:170-88 (1953), were cited in an early civil case. The Crimes Act made it a misdemeanor for an agent, employee or servant who was authorized to procure materials and labor for his master or principal or employer to receive directly or indirectly a commission or bonus for himself from a person who thus furnished materials or performed labor. Defendant in Sandford v. Miller, 80 N.J.L. 411 (E. & A. 1910), interposed those provisions to plaintiff's claim to recover for labor and materials furnished for additions to a dwelling house. The evidence showed that plaintiff had received, unbeknownst to defendant, a 2% discount for paying cash for some materials. The trial court held that the plaintiff was not an agent of the defendant, and therefore, did not reach the question of the applicability of the statute. In dictum the Court of Errors and Appeals noted that if plaintiff had placed himself in a situation where he violated the statute, he could not collect for services rendered or materials supplied. 80 N.J.L. at 415-16.
The Legislature revised the statute and determined that, effective January 1, 1952, the offense of commercial bribery should no longer be a crime but should henceforth constitute the offender as a disorderly person under § 88 of the Disorderly Persons Act. That statute reads as follows:

*350 2A:170-88. Corruption of agents, employees or servants; corporate agents punishable individually.

Any person who gives, offers or promises any gift or gratuity to any employee without the knowledge and consent of his employer, and with the intent to influence his action with relation to his employer's business, and any act employee who, without the knowledge and consent of his employer, requests or accepts any gift or gratuity, or any promise to make a gift or to do act beneficial to himself, under an agreement or understanding that he shall act in any particular manner to his employer's business, is a disorderly person.
Any employee who, being authorized to procure materials, supplies or other articles, either by purchase or contract, or to employ service or labor for his employer, receives directly or indirectly for himself or for another, a commission, discount or bonus from the person who makes such sale or contract or furnishes such materials, supplies or other articles, or from a person who renders such service or labor, and any person who gives or offers such employee such commission, discount or bonus, are each of them a disorderly person.
If a corporation, partnership or other organization is guilty of a violation of this section, the persons through whom it acts are each of them a disorderly person.
In this section the term `employee' includes any agent, employee or servant, and the term `employer' includes any principal, employer or master.[4]
A review of the subject confirms the conclusion that criminal legislation, while most difficult of enforcement, has supplied the basis for claims and defenses in the civil law. See Note, "Control of Nongovernmental Corruption by Criminal Legislation," 108 U.Pa.L.Rev. 848 (1960).[5]
*351 Although the term "commercial bribery" does not appear in the New Jersey statute, the legislation incorporates the two elements necessary to sustain a conviction, i.e., concert of action and the acts of giving and receiving under an agreement or understanding that the receiver shall act in some particular manner in reference to his employer's business. See the analysis by Judge Collester in State v. Aircraft Supplies, Inc., 45 N.J. Super. 110, 116 (Law Div. 1957). See also, Note, "Commercial Bribery: the Need for Legislation in Minnesota," 46 Minn.L. Rev. 599, 618 (1962) for a review of the subject. The economic ramifications of the offending conduct are featured in the oft-cited definition in American Distilling Co. v. Wisconsin Liquor Co., 104 F.2d 582, 585 (7 Cir.1939): "The vice of conduct labelled `commercial bribery' * * * is the advantage which one competitor secures over his fellow competitors by his secret and corrupt dealings with employees or agents of prospective purchasers." It is said that the federal court derived that definition from the one used by the Federal Trade Commission: "The following list illustrates unfair methods of competition * * * 4. Bribing buyers or other employees of customers * * without employers' knowledge * * * to obtain or hold patronage." 1957-58 FTC Ann.Rep. 81. See Note, 108 U.Pa.L. Rev. at 850, n. 19.
It is within the context of the New Jersey statute, supplemented by reference to the decisional law of New York, that defendant Edison submits its defense. Edison urges this court to hold that one who resorts to the acts employed by Jaclyn should be denied the right of recovering the agreed price of the goods sold and delivered, notwithstanding that the merchandise was retained by Edison and retailed at a profit.
Most of the reported civil actions have arisen under the New York commercial bribery statute, Penal Law Sec. 439 (now Penal Law, § 180.00 et seq. (McKinney, 1967), as reflected in the *352 citations in the memoranda submitted by the parties. See Annotation, "Validity and Construction of Statutes Punishing Commercial Bribery," 1 A.L.R.3d 1350 (1965), especially §§ 7 and 9. The New York statute, set out in the margin, includes provisions similar to those found in the New Jersey counterpart.[6]
The leading case is Sirkin v. Fourteenth Street Store, 124 App.Div. 384, 108 N.Y.S. 830 (App.Div. 1908). Plaintiff had secured an order from defendant's purchasing agent by the payment of a secret commission. Defendant received the goods, learned of the bribe, and then refused to pay the purchase price, although the contract price was no more than the market price. The Appellate Division reversed a directed verdict for plaintiff because defendant had not been allowed to prove a violation of the New York Penal Code, § 384r, predecessor to § 439. The appellate court explained the reversal in the passage here quoted:
It must be assumed that the defendant might have proved, ... that the corrupt offer and agreement on the part of the plaintiff to pay the defendant's agent 5 per cent. on the orders received was the inducing cause for placing the orders with the plaintiff, and that the agreement on the part of the latter so to place the orders constituted one transaction. [108 N.Y.S., at 832].
The opinion stands for the principle, with roots deep in the civil law, that a contract to do an illegal act, or made in violation of a penal statute, is void and unenforceable.
*353 The holding in Sirkin was contemporaneously criticized as unduly harsh in imposing a penalty far in excess of that mandated by the statute. See Notes, 8 Colum.L.Rev. 408 (1908); 21 Harv.L.Rev. 541 (1908). The Sirkin opinion has been followed over the years. See, among numerous opinions, Bolotin v. Jefferson, 98 Misc. 603, 163 N.Y.S. 59 (Sup.App.Term 1917); Stone v. Freeman, 298 N.Y. 268, 82 N.E.2d 571 (Ct.App. 1948). A refinement of the standards to be applied was delineated in McConnell v. Commonwealth Pictures Corp., 7 N.Y.2d 465, 199 N.Y.S.2d 483, 487, 166 N.E.2d 494, 497 (Ct.App. 1960):
It is not every minor wrongdoing in the course of contract performance that will insulate the other party from liability for work done or goods furnished. There must at least be a direct connection between the illegal transaction and the obligation sued upon. Connection is a matter of degree. Some illegalities are merely incidental to the contract sued upon. Messersmith v. American Fidelity Co., 187 App.Div. 35, 175 N.Y.S. 169, affirmed 232 N.Y. 161, 133 N.E. 432, 19 A.L.R. 876; De Persia v. Merchants Mut. Cas. Co., 268 App.Div. 176, 49 N.Y.S.2d 324, affirmed 294 N.Y. 708, 61 N.E.2d 449.
The requisite of a direct connection between the illegal transaction and the obligation sued upon, as emphasized in McConnell, was controlling in Colyvas v. Red Hand Compositions Co., 318 F. Supp. 1376 (S.D.N.Y. 1970). McConnell drew support from Merchants' Line v. Baltimore & O.R. Co., 222 N.Y. 344, 118 N.E. 788 (Ct.App. 1918), in which case a contract was enforced despite the payment of secret commissions to defendant's agent where it was shown that the bribed agent had nothing to do with the contract sued upon. Prior to McConnell courts probed the record in search of an independent legal consideration which would sustain the contract notwithstanding a peripheral element of wrongdoing. By contrast, courts in recent years have focused upon "the extent and seriousness of the illegal conduct and its relationship to the contract at issue" before denying recovery. Nathan v. Tenna Corp., 560 F.2d 761, 764 (7 Cir.1977).[7] See *354 Granirer, "Recovery of Secret Commissions and Gratuities  Section 439 of Penal Law Construed," 19 Queens B. Bull. 38 (1955), for a review of the cases arising under New York law to the date of publication. Thus, entertaining a buyer has not been considered an unfair method of competition in actions brought by the Federal Trade Commission. See New Jersey Asbestos Co. v. Federal Trade Comm'n, 264 F. 509 (2 Cir.1920) in which the court took judicial notice of the fact that entertaining a buyer was "an incident of business from time immemorial" and impliedly fell within the exemption of the "knowledge and consent" qualification of the pertinent regulation.
The evil of commercial bribery is the invasion of the principal's right to undivided loyalty from his agent which results from secret payments to the agent. The party which interposes the defense must establish that the payments to the agent were made secretly, i.e., without the knowledge and consent of the principal, and must be attended with the intent to influence the agent's action with respect to his employer's business. Whether viewed from the aspect of the briber or from the aspect of the recipient, these dual elements must be proved.
As to the quantum of proof, the defense of commercial bribery must be established with clarity and definiteness, lest it *355 be resorted to for improper, even illegal, purposes. Shemin v. A. Black & Co., 19 A.D.2d 596, 240 N.Y.S.2d 622 (App.Div. 1963), motion to dismiss app. den., 14 N.Y.2d 727, 250 N.Y.S.2d 72, 199 N.E.2d 169 (Ct.App. 1964), app. dism. 14 N.Y.2d 755, 250 N.Y.S.2d 438, 199 N.E.2d 515 (Ct.App. 1964). However, evidence of the payment of consideration, above a nominal value, whether called gifts, commissions, discounts or other, without the knowledge and consent of the principal, may raise legitimate inferences that the intent is to influence the agent in his office. That evidential principle was succinctly stated in Sears, Roebuck & Co. v. American Plumbing and Supply Co., 19 F.R.D. 334, 343 (E.D.Wis. 1956):
People are presumed to intend the natural and probable consequences of their acts. Payment of secret commissions under such circumstances can have only one purpose, namely, that of making the agent of the adverse party beholden to the person giving the secret commissions.
Likewise, the acceptance and retention of secret commissions creates an inference that the recipient agrees to act in a special way in relation to his employer's business.
The defense of commercial bribery is to be credited "with great caution, and only where there is a clear preponderance of the evidence." Mutual Coal Co. v. H.G. Realty Co., 130 N.Y.S. 169 (Sup.App.Term 1911), aff'd 149 App.Div. 946, 134 N.Y.S. 1139 (App.Div. 1912). Thus, when an act will permit two possible connotations, "the courts will presume the parties intended to act legally, and view the transaction from that standpoint." Jablon v. Traynor,, 76 Misc. 532, 135 N.Y.S. 545 (App.Div. 1912).
Lastly, when a defense arises from a penal statute, as does the defense of commercial bribery, that statute must be strictly construed. Shemin v. A. Black & Co., supra.
The defense of commercial bribery has been held inapplicable when commissions paid to an agent had been made with the full *356 knowledge and consent of his principal. The leading case which established that principle, Ballin v. Fourteenth Street Store, 123 App.Div. 582, 108 N.Y.S. 26 (App.Div. 1908), aff'd 195 N.Y. 580, 89 N.E. 1095 (Ct.App. 1909), was rendered within months of the Sirkin opinion, with which it shares recognition in this area of the law. The term "full knowledge" has been equated to sufficient knowledge such that the principal is not in ignorance of the bribery scheme and hence has not been misled or defrauded. Ballin, supra. In a correlative connection, where "full and complete knowledge" is required under New Jersey law before a principal can be said to have ratified an unauthorized act of his agent, Passaic-Bergen Lumber Co. v. U.S. Trust Co., 110 N.J.L. 315 (E. & A. 1933), that standard has been held satisfied when "alerting circumstantial information" of the agent's unauthorized acts was made known to the principal. MacLeod v. Ajax Distributing Co., 22 N.J. Super. 121, 127 (App.Div. 1952).
In the Ballin case the principal was informed by his purchasing agent of a scheme whereby the agent was to be paid commissions by the seller. Intending "to make a test case," the purchaser consummated the sale. The court concluded, in affirming judgment for plaintiff, that because the purchaser was aware of the circumstances surrounding the contract, he rendered himself liable for the purchase price. The extensive recognition accorded the holding is underscored by the fact that, under the New York statute, the absence of knowledge on the principal's part is not an element of the offense when a purchasing agent is involved. Equally noteworthy is the fact of plaintiff's prior conviction under the statute. It should be emphasized that even though the New York penal statute had been violated, the policy behind the statute was held not violated by reason of the principal's knowledge and consent to the transaction. Moreover, a purchasing agent was involved, as in the case at bar, but the finding of knowledge and consent on the part of the principal was, nonetheless, controlling and dispositive. The *357 Ballin principle has been applied in, among many other cases, General Auto Supply Co. v. Rockwell, 162 N.Y.S. 210 (City Ct. 1916); Cholot v. Strohm, 235 App.Div. 150, 256 N.Y.S. 647 (App.Div. 1932); Clyde v. Schaller, 263 App.Div. 844, 31 N.Y.S.2d 686 (App.Div. 1941); June Fabrics v. Teri Sue Fashions, 194 Misc. 267, 81 N.Y.S.2d 877 (Sup.Ct. 1948). See also, Sears, Roebuck & Co. v. American Plumbing and Supply Co., supra, 19 F.R.D. at 343; Fiambolis v. United States, 152 F. Supp. 10 (D.S.Car. 1957).
There is no fraud perpetrated upon a principal when he is made aware of the commissions or gifts paid to his agent by another, but nonetheless consummates an agreement negotiated on his behalf. The consent thereto may be implied by the court from the principal's acquiescence, whether that acquiescence takes the form of "making a test case" or of maintaining the status quo while accumulating more evidence. See Ballin, supra; also People v. Davis, 33 N.Y.Crim. 460, 160 N.Y.S. 769 (Sp.Sess. 1915), in which opinion the court observed:
But if the bonus or commission * * * is fully known to the employer . . how can we say that this is a secret commission, and that the employer has been dealt treacherously and betrayed? [160 N.Y.S. at 776]
The Sirkin court itself noted that
* * * the vice lies in making an agreement without the knowledge of the master. * * * [A]nd it may well be * * * that, where the bribe is received with the knowledge of the master, the statute does not apply, and the contract of sale will be enforced. [108 N.Y.S. at 835]
This court has made findings of fact, concluding that Edison had reliable knowledge in January 1976 of Jaclyn's payoffs to purchasing agents. Reference is here made to the payments to Rosen of gift certificates and of cash, both episodes construed as "attempted bribery" by the head of Edison's legal department and executive vice-president, Eric Newman, all of which led that officer to conclude that if an associate buyer was being paid off, *358 then the buyer was "getting the big money"; of Rosen's report to Talcoff, vice-president, that Jaclyn paid Fingerhut, senior buyer, $23,000 "recently," a report relayed to Julian Edison, president; of a report that Fingerhut was "currently" receiving kickbacks from a manufacturer which were "laundered" through the bank account of that buyer's son, a report confirmed by receipt of a cancelled check; of a report that Olla Industries had paid off Fingerhut over the years.
Additionally, Edison knew of the private meeting of Fingerhut with Abe Ginsburg in January 1975 when relations resumed, and of the magnitude of purchases placed by Fingerhut over the ensuing months. That Edison's executives gave credence to, and placed great weight upon, this compendium of knowledge is apparent from the fact that they terminated Fingerhut even prior to his admission of any wrongdoing. Thus, the court concludes that Edison Brothers possessed more than "alerting circumstantial information" and reached a definite belief in Fingerhut's involvement in commercial bribery as early as January, 1976, prior to the placement of any of the orders which form the basis of plaintiffs' claims.
The cumulative impact of Edison's acquiescence while possessing relevant information of the covert payments was to impart to it that degree of knowledge and consent which defuses the defense of commercial bribery. The knowledge was of sufficient adequacy, both qualitatively and quantitatively, to support the determination that Edison Brothers was not misled or defrauded by Jaclyn's conduct. Moreover, the correlative element of consent does not demand proof of formal consent; acquiescence may be inferred by the court when a principal, armed with knowledge of the disloyalty of its agent, retains the agent in a position to contract on its behalf and thereafter accepts the fruit of that agency. The Ballin opinion and its progeny contribute *359 authority for these determinations. See also, In re Lange, 75 N.J. 464 (1978).
It would be unconscionable to permit a principal, possessed of knowledge that its agent has received covert compensation, to allow that agent to continue to contract in its name, and thereafter to avoid liability for the bargained-for exchange. A principal may rely upon his agent's faithfulness only until the principal acquires knowledge of a breach of trust of relational duties. Fisher v. Grady, 131 Fla. 1, 178 So. 852 (Sup.Ct. 1938); Haswell v. Standring, 152 Iowa 291, 132 N.W. 417 (Sup.Ct. 1911). Upon acquiring knowledge that his agent has solicited or received bribes, the principal has the option, prior to consummating a contract negotiated through such agent, of either adopting or disaffirming his agent's conduct.
Assent of the principal in such cases should not be confused with the familiar doctrines of ratification, estoppel or waiver, which are invoked against contracts which are voidable at the option of the principal, rather than void.[8] It is the settled law of both New York and New Jersey that an illegal act is incapable of being ratified. Sirkin, supra, 108 N.Y.S. at 835; Babcock v. Warner Bros. Theatres, 240 App.Div. 466, 270 N.Y.S. 765 (App.Div. 1934); McCarthy v. Nat'l Ass'n. for Stock Car Auto Racing, etc., 90 N.J. Super. 574 (App.Div. 1966), aff'd 48 N.J. 539 (1967).
*360 The court recognizes that prosecutions under the New Jersey statute of purchasing agents who receive, and of persons who give or offer a commission, discount or bonus do not require proof of knowledge and consent on the part of the principal. N.J.S.A. 2A:170-88. However, the statute cited has no application in the civil context herein defined unless the contract in question is violative of the public policy of the state. The policy of the statute, taken as a whole, is not violated when payments declared to be prohibited are made with the knowledge of the principal who for a period of several months thereafter manifests its acquiescence by permitting its agent to contract on its behalf and who retains the delivered merchandise. In such circumstances the principal will not be heard to argue that the contracts negotiated by its agent are void in contravention of public policy.
The executives of Edison Brothers, in possession of reliable information of its agent's disloyal conduct in January 1976, decided to "conduct an investigation" by which the purposeful decision was made not to confront the offending agent. It was not until mid-April 1976 that Edison Brothers engaged outside legal counsel, and it was not until May 10, 1976 that the disloyal agent was called to account. In the interim, merchandise worth *361 hundreds of thousands of dollars was ordered by the agent with the tacit, if not the express, approval of Edison Brothers. As the purchaser in Ballin, aware of the circumstances surrounding the contract, but desiring "to make a test case," rendered himself liable, so here, Edison Brothers, "not wanting to take any action either in confronting them [its buyers] or changing its resource policy," rendered itself liable.
Finally, did Edison prove by a preponderance of the credible evidence, and with the clarity and definiteness demanded, that payments from Jaclyn to Fingerhut were the inducing cause of the contracts to purchase? Such an element is a sine qua non of the commercial bribery defense. Sirkin v. Fourteenth Street Store, supra, 108 N.Y.S. at 837; McConnell v. Commonwealth Pictures Corp., supra, in which the court wrote in upholding the defense:
We point out that our holding is limited to cases in which the illegal performance of a contract originally valid takes the form of commercial bribery or similar conduct and in which the illegality is central to or a dominant part of the plaintiff's whole course of conduct in performance of the contract. [199 N.Y.S.2d at 487]
At the outset the court notes that numerous purchase orders had been placed by buyers other than Fingerhut. Of the total claims in suit, the orders placed by buyer Henry Winer comprise a claim for $63,608.11. There is no evidence to support a finding that those transactions were attended by as much as a token consideration moving from Jaclyn to Winer. The claim also includes the merchandise delivered on the order of Dennis Kaufman, an associate buyer, in the amount of $40,750.74 from Jaclyn, and from Empress Handbag Company in the amount of $15,409.44. The singular reference in the record to Kaufman is his receipt of four gift checks of a total value of $100 from Empress at Christmas 1975. The evidence is deficient to tie that episode to any scheme of commercial bribery. Accordingly, the *362 named plaintiffs are entitled to entry of a judgment against defendant in the respective amounts aforementioned.
Before leaving St. Louis in January 1975 Edison's executives discussed the flo-molded line of Jaclyn and considered buying that line. Jaclyn manufactured what was described as "the hottest thing in the country" and 800 managers were clamouring for the handbags. As already noted in this opinion, Edison would have paid the asking price, so anxious was it to acquire the merchandise for its stores. Whatever may have transpired at the private dinner meeting of January 9, 1975, it was Herbert Talcoff, vice-president and director of accessories, who headed Edison's delegation and who exercised the decision-making authority on what he referred to as "my buying trip to New York." Talcoff testified that his buyers did not approach Jaclyn earlier because Jaclyn would not sell at a price compatible to Edison's mark-up. There is no evidence that Fingerhut was approached by Jaclyn prior to 1975. The record leads to the conclusion that the initial orders were placed because of the intrinsic quality of the merchandise coupled with a discount of 6%, which was higher than Fingerhut had discussed at his private session and represented the most favorable quotation extended to any Jaclyn customer.
The initial orders sold so well at the Baker-Leeds Division that Talcoff recommended to Henry Winer and Edward Rosen that they place orders for the Chandler Division. That Talcoff was fully informed of the repeat orders placed throughout 1975 is deduced from his acknowledgement that Jaclyn "could tell from the amount that we were buying" that their handbags were moving well. The record amply supports the conclusion that Talcoff, cognizant of Fingerhut's disloyalty, safeguarded Edison from Jaclyn's influence in several ways: accompanying Fingerhut to New York on major buying trips, by resort to weekly recap reports and bimonthly mark-up print-outs, and by presiding over weekly and biweekly conferences with Fingerhut, other *363 buyers, associate buyers and merchandisers. Evidence of such surveillance supports the reasonable inference that Talcoff was satisfied with the purchasing and market performance of Jaclyn's merchandise, whether that merchandise had been ordered by Fingerhut or by any other member of his staff. Except for a slight dip in sales for December 1975, Jaclyn's products proved to be a consistently superior selling line into 1976. Indeed, Talcoff and his aides visited Jaclyn's showrooms in January and March, 1976, and placed orders. It is reasonable to assume that Talcoff took an even greater interest in purchasing decisions after he received reports of attempted bribery from Rosen during the preceding holiday season.[9]
Although Fingerhut had discretion in Edison's buying structure to place orders among various vendors, the decision-making authority reposed in what this court describes as a "collegium," best described by Talcoff when he testified that a buyer, such as Fingerhut, was "not completely free" to place orders:
A. He was restricted because it wasn't a buyer's decision solely as to what was bought. He had an associate buyer working with him and he had merchandisers working under him, who also had an input into what was bought.
Edison's buyers, associate buyers and merchandisers participated in the system of collegiality, with access to sophisticated *364 analytic tools of market performance, tools of seismographic market sensitivity, a system which Talcoff said he "assumed at the time it was working like that," meaning working as it was designed to work. Rosen added that the system was in effect during 1975-76, "although not 100 percent."
One additional reference will serve to establish Talcoff's preeminent role. There is no more crucial element in contract negotiations than that relating to price. Talcoff left no doubt as to who played the master role in negotiating price. He met with Abe Ginsburg at the initial meeting January 10, 1975 and tried to bargain for a higher discount than 6%. Talcoff, not Fingerhut, negotiated the price for the succeeding orders as the following excerpt from his testimony will confirm:
Q. Now, between the time that you approved the purchase in January of '76 of the two styles in the Jaclyn line, which * * *. A. '75.
Q. In '75, you knew to be good sellers, did you at any time after that in your trips to New York, whether they be three or four between that date and March of 1976, which was the last time you met with representatives of Jaclyn, attempt to negotiate a better price for the goods?
A. I think we probably discussed it. If not, every time we saw them, probably several of the times.
Q. `We' meaning `you' on behalf of Edison discussed it with. * * *
A. `We' meaning me. I and whatever buyer or associate buyer I was with at the time.
It is the conclusion of the court, based upon the evidence here collated, that the numerous reorders amounting to approximately one-half million dollars worth of handbags were placed during early 1976 by Edison because of the intrinsic quality and demand for the merchandise.
Counsel for Edison impliedly concedes that it was the gravitational attraction of Jaclyn's unique merchandise which brought about the initial purchase orders, for he argues that it was Jaclyn's gifts to buyers which were designed "to perpetuate" the *365 great success of their innovative flo-molded process. Yet Edison did not produce at trial any recap sheets to support its thesis that Fingerhut's personal interests and not Edison's needs induced the orders. However, as the highlights of the record here assembled establish, it was compelling economic forces which governed every decision of Edison throughout the 17-month relationship with Jaclyn. Indeed, during the months when Edison imposed an embargo on further deliveries, one is caused to speculate whether Edison would have acted so indulgently towards Jaclyn had its orders represented a risky investment.
Edison has not established by the relevant standard of proof that the payments from Jaclyn to Joseph Fingerhut induced the purchase orders which form the basis of the claims in suit, and accordingly Jaclyn is entitled to recover for goods sold and delivered.

The Award of Interest
Edison argues that, should Jaclyn be awarded any recovery, pre-judgment interest thereon should be disallowed on equitable principles, citing Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123 (1976). In that case the deceitful conduct of defendant-counterclaimant induced the sale of the goods for which it sought recovery. By contrast, this court has already singled out for mention the purchase orders placed by Henry Winer and by Dennis Kaufman against which the evidence of illicit payments was either lacking or deficient. Additionally, the court has made findings of fact and conclusions of law that, as to the purchase orders emanating from the "Fingerhut Group," Edison had prior knowledge of the receipt by the senior buyer of covert compensation, and by its conduct acquiesced in the buyer's transactions. Additionally, the court has made a legal determination that the payments from Jaclyn to Fingerhut were not the inducing cause of the placing of the purchase orders.
*366 The parties have stipulated that the goods were sold and delivered. There is no dispute that the amount of the invoices is a liquidated amount. It follows that the payment for the goods in question should not have been detained. Interest is not avoided by litigation in good faith over liability. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 507, 510 (1974); Bachman Chocolate Mfg. Co. v. Lehigh Whs. & Truck., Co., 1 N.J. 239 (1949); Kamens v. Fortugno, 108 N.J. Super. 544, 548 (Ch.Div. 1970).
In resolving the issue of the award of interest, such equitable considerations as the length of time that defendant has had the benefit of plaintiffs' performance must be weighed. Kamens, supra, 108 N.J. Super. at 553-554. Edison has enjoyed the benefit of plaintiffs' performance since August 1976, and has had the use of the retained purchase price for approximately three years, upon which sums the defendant could earn interest. The application of legal and equitable principles lead to the determination that the judgments should be entered with interest in favor of the respective plaintiffs against defendant.

Edison's Counterclaim
Edison Brothers has filed a counterclaim against the corporate plaintiffs and has impleaded as additional parties three named principals of the corporations, Abe Ginsburg, Howard Ginsburg and Alex Chestnov. The pleading is framed in ten counts. The first three counts plead a common allegation, specifically, that the named principals "furtively, secretly, wantonly, maliciously and controlled by their own personal interest and desire for secret gains and with the intent to defraud defendant, paid and promised to pay directly and indirectly by way of secret payments to defendant's employees, buyers and purchasing agents, commissions, discounts, bribes, kickbacks, gifts, gratuities, bonuses and the like type of payments." As a result of the *367 payments alleged, the prices paid by defendant for merchandise "allegedly sold to it by plaintiffs * * * were in excess of their fair and reasonable value by at least the amount of the secret payments paid by plaintiffs * * * as well as by additional loading of said prices by plaintiffs and Abe Ginsburg, Howard Ginsburg and Alex Chestnov". Edison Brothers prays for damages of "at least $500,000." Successive counts repeat the contentions here summarized, with the additional allegations of violations of § 180.00 of the Penal Law of the State of New York; conspiracy to defraud the defendant, culminating in "excessive and loaded" payments for merchandise; unfair trade practices which have "wrongfully interfered with the free exercise of competition," for which pecuniary and punitive damages as well as injunctive relief are sought, and finally, reimbursement for costs for prosecution of this action. Jaclyn and the named principals filed general denials to the respective allegations.
Courts have fashioned two theories of relief to a principal whose agent's loyalty has been subverted by payments of secret commissions. A cause of action sounding in tort is represented by Continental Management, Inc. v. United States, 527 F.2d 613, 208 Ct.Cl. 501 (1975). Alternatively, other courts have imposed a constructive trust upon payments received by an agent, declaring the third party as a trustee ex maleficio. See Sears, Roebuck & Co. v. American Plumbing and Supply Co., supra, 19 F.R.D. 334 (E.D.Wis. 1956); Central Illinois Public Service Co. v. Schell, 238 Ill. App. 560, 565 (App.Ct. 1925). Although the precise issues presented in the case at bar have not been considered by New Jersey courts, it would appear that our jurisprudence would accommodate both theories of relief. See Hirsch v. Schwartz, 87 N.J. Super. 382 (App.Div. 1965), for the principle that one who causes or assists an agent to violate his duty may be liable to his principal, and Hirsch v. Phily, 4 N.J. 408 (1950), in which an agent was declared a constructive trustee for profits retained against his principal.
*368 This court adopts the reasoning and holding of Continental Management, Inc. v. United States, supra, in which the federal court, relying upon authority which included the New Jersey cases of Hirsch v. Schwartz, supra, and Kuntz v. Tonnele, supra, 80 N.J. Eq. 373 (1912), held that a third party who knowingly aids and abets the agent of another in breach of fiduciary duty by tendering secret payments to the agent, is liable to the principal for the commissions paid.
A principal may be estopped from recovering on commissions paid to his agent by a third party where it is shown that the principal validated, by implied or express authorization, the arrangement while possessed of full knowledge of the material facts. See Liberty Title & Trust Co. v. Plews, 6 N.J. 28 (1950); Blauvelt v. Citizens Trust Co., 3 N.J. 545 (1950); Kuntz v. Tonnele, supra; In re Lange, supra, 75 N.J. 464, 477, n. 8. However, where a third party knows or has reason to know that an agent is acting for the agent's own benefit or for other improper motives instead of for his principal's benefit, the third person is precluded from later claiming that his obligation to the principal has been discharged by the payment to the agent. See Gross v. Grimaldi, 64 N.J. Super. 457, 463 (App.Div. 1961).
This court finds that Jaclyn knowingly aided and abetted Joseph Fingerhut in breach of his fiduciary trust by making payments without authorization from Edison Brothers, and hence incurs liability for all commissions paid during 1975 and 1976. This court's earlier determination that Edison is liable for the contracts negotiated by its disloyal agent after Edison acquired reliable knowledge of the illicit payments does not detract from Edison's claim for those payments. There being no evidence of authorization for Jaclyn to transact privately with Fingerhut, nor any evidence of waiver of the payments received by its agent, Edison is not precluded in prosecuting its claim, Jaclyn, being a partner to Fingerhut's self-serving conduct, may *369 not be heard to plead detrimental reliance upon any express or implied authority from Edison.
An agent is presumed to be acting with absolute devotion to his principal at all times. Any receipt of commissions or bonuses by an agent from a third person is presumed in law to be for the benefit of the principal, unless estoppel is present to intercept the claim. The record at bar does not raise waiver nor estoppel to Edison's right to recover.
This court concludes that Edison is entitled to commissions of $2,400 for the 12 months of 1975 and $1,000 paid during 1976, the record having established that Fingerhut admitted to receipt of an "occasional $500-$600" from Jaclyn. The mere difficulty or lack of certainty of proof touching the quantum of recovery does not inhibit an award to a deserving party. "The amount of the bribe paid to the agent provides a reasonable measure of damages, in the absence of a more precise yardstick." Continental Management, Inc. v. United States, supra, 527 F.2d at 619. See also Tessmar v. Grosner, 23 N.J. 193 (1957), from which the passage which follows is drawn:
If the evidence affords a basis for estimating the damages with some reasonable degree of certainty, it is sufficient. Wolcott, Johnson & Co. v. Mount, 36 N.J.L. 262, 272 (Sup.Ct. 1873), affirmed 38 N.J.L. 496 (E. & A. 1875). The rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery. [at 203.]
"Doubts are resolved against the breaching party." Sandler v. Lawn-A-Mat Chem. and Equip. Corp., supra, 141 N.J. Super. at 454. Drawing from the conclusion of the Appellate Division in the case cited, the inquiry is whether or not the estimate of the trial court has "a reasonable basis in the record evidence and, although not exact represents an approximate and conservative result legally warranted by the particular circumstances of the case". Ibid. The Court of Claims addressed the same issue in *370 Continental Management Inc. v. United States, supra, and expressed its conclusions in the words here quoted:
It is an old maxim of the law that, where the fact of injury is adequately shown, the court should not cavil at the absence of specific or detailed proof of damages. [527 F.2d 619.]
Mitigation of damages has not been pleaded as an affirmative defense by Jaclyn, nor has any evidence been presented to raise such a defense. A judgment will be granted to Edison Brothers in the amount of $3,400 against Jaclyn, Inc., and against the corporate officers, Abe Ginsburg, Howard Ginsburg and Alex Chestnov, jointly and severally.

Punitive Damages
The court must determine whether punitive damages are appropriate in this case. The Supreme Court has recently discussed punitive damages in depth in Leimgruber v. Claridge Associates, Ltd., 73 N.J. 450 (1977). Chief Justice Hughes, writing for a unanimous court, noted that punitive or exemplary damages are awarded when the wrongdoer's conduct is especially egregious. "They are awarded upon a theory of punishment to the offender for aggravated misconduct and to deter such conduct in the future". Id. at 454.
While punitive damages have been recognized in tort actions, increasingly such relief has been extended to contract actions, a trend followed by New Jersey courts "at least where there is some form of special relationship existing between the parties". Kocse v. Liberty Mut. Ins. Co., 152 N.J. Super. 371, 378 (Law Div. 1977). That trend is reflected in the observations of the Appellate Division in Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J. Super. 437 (App.Div. 1976), certif. den. 71 N.J. 503 here quoted:
We do not mean to conclude * * * that the right to punitive damages should turn simply upon the form of action involved, namely, whether it is designated as a tort rather than a contract. There may arise a case involving such an aggravated set of facts that punitive damages might be appropriate regardless of the contract form of the cause of action and even though it may be *371 beyond the scope of the recognized exceptions in the adjudicated cases. [141 N.J. Super. at 451.]
Illustrative of the trend is the award of punitive damages for a breach of fiduciary relationship between an insurer and its insured. Rova Farms Resort Inc. v. Investors Ins. Co. of America, 65 N.J. 474 (1974). See Miner, "Expanding Availability of Punitive Damages in Contract Actions," 8 Ind.L.Rev. 668 (1975); see also Annotation, "Rights of principal to recover punitive damages for agents or broker's breach of duty", 67 A.L.R.2d 952 (1959).
The Supreme Court in Leimgruber, supra, also provided some guidance in assessing such damages. It is instructive to quote extensively from that opinion:
The decision to award exemplary damages and the amount thereof rests within the sound discretion of the trier of fact. Fisher v. Volz, [496 F.2d 333 (3d Cir.1974)] supra; Cabakov v. Thatcher, [37 N.J. Super. 249, 117 A.2d 298 (App.Div.)] supra; Dobbs, Remedies § 3.9, at 218 (1973); Restatement (Second) of Torts, § 908, Comment d (Tent. Draft No. 19, 1973). In assessing such damages, the trier of fact should take into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances which may operate to reduce the amount of the damages. Restatement (Second) of Torts, § 908(2) (Tent. Draft No. 19, 1973); 22 Am.Jur.2d Damages § 263 (1965).
* * * * * * * *
Despite the lack of an established standard by which the amount of punitive damages may be fixed, the general doctrine is that the exemplary damages awarded must bear some reasonable relation to the injury inflicted and the cause of the injury. But the obvious proposition that the amount of damages should be related to the severity of the wrongful conduct and the scope of the resulting injury does not provide much meaningful guidance for setting the amount of the award, and certainly does not call for a fixed ratio between compensatory and punitive damages awarded. [73 N.J. at 456-457.]
In applying these standards to the findings made herein, this court concludes that the record amply spells out a situation which warrants the imposition of punitive damages against *372 Jaclyn. The court reserves its most censorious language to the conduct of Jaclyn which amounted to an intentional and deliberate invasion of the fiduciary relationship between Edison Brothers and its senior buyer. Jaclyn's corrosive pattern of covert payments to the agents of its vendees was pursued with knowledge of a high degree of probability of harm attended with a reckless indifference to the consequences. The ramifications of such disreputable conduct is not only subversive of fair dealing between businessmen but destructive of the free market system. Jaclyn's wrongdoing has the character of outrage frequently associated with crime. Indeed, its conduct contravenes the penal code, and in so doing it desecrates the sanctity of the fiduciary bond, a privileged relationship entitled to the most inclusive judicial safeguards.
In calculating the award of punitive damages the court takes into account that the harm went beyond one company in that the opprobrious practices of Jaclyn defiled the industry. The court considers the economic costs of the investigation conducted by Edison Brothers, culminating in the termination of its senior buyer and the internal readjustments in replacing that staff member. Yet to be mentioned is the dishonor, obloquy and suspicion visited upon numerous staff members of defendant to say nothing of the personnel of other retail establishments throughout the country who felt the reverberations of the damaging disclosures through pretrial discovery. The court takes note of the wealth of Jaclyn as reflected in the value of its annual sales in the millions of dollars and its preeminent position in the handbag industry. Finally, Jaclyn has not pleaded nor established any mitigating circumstances. The cumulative impact of these factors constrain this court to award Edison Brothers $75,000 by way of punitive damages to serve as a deterrent. Prejudgment interest has not application to awards of punitive damages. R. 4:42-11(b); Belinski v. Goodman, 139 N.J. Super. 351, 360 (App.Div. 1976).

*373 Conclusion

A judgment will be entered in favor of Jaclyn, Inc., in the sum of $213,377.25; in favor of Bonnie International, in the sum of $110,047.31; in favor of Empress Handbag Company, Inc., in the sum of $106,113.77, all against Edison Brothers Stores, Inc., with interest and costs to be taxed.
On the counterclaim, a judgment will be entered in favor of Edison Brothers Stores, Inc., against Jaclyn, Inc., Bonnie International, Empress Handbag Company, Inc., Abe Ginsburg, Howard Ginsburg and Alex Chestnov, corporate officers, jointly and severally, in the sum of $3,400 with interest, court costs and cost of depositions on the counterclaim to be taxed, and in the sum of $75,000, representing punitive damages.
NOTES
[1] Counsel have stipulated that the court may resort to deposition testimony of Herbert Talcoff in toto. Two depositions were taken of that witness, the first on December 28, 1977 and the second January 13, 1978.
[2] Classy Leather Co., of upstate New York, did very little business with Edison Brothers and consequently is discounted as a source of the currency.
[3] Rosen's ambivalent reaction to the receipt and retention of gifts becomes understandable in light of his admissions that he and his fellow merchandisers at Edison received and retained gifts from vendors other than Jaclyn from 1967 through 1972. As recently as 1975-1976 Rosen admitted, albeit with regret, that he retained $100 in cash but turned over other gifts to his employer. Indeed, Rosen said he acted as a distributor of gifts to his merchandisers on behalf of a supplier for two years. Such practices, although prohibited by company policy, did not constrain Edison to sever its relationships with, the offending suppliers.
[4] The New Jersey Legislature, by enactment of the Model Penal Code, repealed § 88. The Model Penal Code confines the offense of commercial bribery to the conduct of one who "solicits, accepts or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate" a fiduciary duty. The degree of the offense is correlated to the amount of pecuniary benefit derived from the violation. L. 1978, c. 95, § 2C:21-10, eff. Sept. 1, 1979. N.J.S.A. 2C:21-10.
[5] The reports reflect very few prosecutions under the Crimes Act or successive revisions thereof. See State v. Landecker, 100 N.J.L. 195 (Sup.Ct. 1924), aff'd 103 N.J.L. 716 (E. & A. 1927); State v. Aircraft Supplies, Inc., 45 N.J. Super. 110 (Law Div. 1957). One researcher found that as of 1960, only seven criminal cases were reported which involved the enforcement of the parallel provisions of the New York Penal Law, § 493, now New York Penal Law, § 180.00 (McKinney, 1967). Note, 108 U.Pa.L.Rev. 848 (1960).
[6] "A person who gives, offers or promises to an agent, employee or servant of another, any gift or gratuity whatever, without the knowledge and consent of the principal, employer or master of such agent, employee or servant, with intent to influence such agent's, employee's or servant's action in relation to his principal's, employer's or master's business * * * is guilty of a misdemeanor". New York Penal Law, § 439.

It is also declared to be a misdemeanor to solicit or accept such a bribe. The statute also forbids a purchasing agent to receive a commission from a seller while acting on behalf of his employer, and likewise forbids the seller to offer such a commission. Knowledge and consent on the part of the employer are omitted from the section of the New York Penal Law relating to purchasing agents. New York Penal Law §§ 180.00-180.05 (McKinney, 1967), effective September 1, 1967.
[7] Edison's counsel cites Manning Engineering, Inc. v. Hudson Cty. Park Comm'n, 74 N.J. 113 (1977). The Supreme Court held that the overriding public policy was to see that public contracts are awarded free of illegality or favoritism. However, the court drew a clear distinction between the judicial standards applied to the enforcement of public contracts vis-a-vis private contracts, noting that in the nonpublic contract area the doctrine of "collateralness" and "remoteness" will be applied to enforce an otherwise legal contract unless it is clearly established that the inducement for the award of the contract was, itself, an illegal act. Such considerations, the court concluded, have no merit when the contract under consideration is a public contract.

Usually, private contracts concern only the parties thereto, and it is optional with a person who had discovered that he has been defrauded whether to ratify the contract or to rescind it. This distinction was noted by the court in Sirkin v. Fourteenth St. Store, supra, 108 N.Y.S. at 835.
[8] For the principle that there can be no ratification of an illegal contract, Edison cites Nathan v. Tenna Corp., supra, 560 F.2d 761 (7 Cir.1977), a case which may be distinguished from the case at bar on every salient feature. Firstly, the Nathan case turned on the application of the doctrines of ratification and of waiver which could not rebut the defense of commercial bribery; by contrast, in the case at bar it is the doctrine of knowledge and assent which establish the enforceability of the claims. Secondly, unlike the situation in the Nathan case, the principal of the bribed agent in the present case possessed knowledge of the illicit payments. Thirdly, in Nathan, despite plaintiff's claims for commissions of purchase orders disassociated from his prior illegal conduct, the court denied enforcement of a single master contract on which plaintiff based his action, finding that his prior illegal performance tainted the entire agreement, rendering it unenforceable, whereas at bar, the issues concern illegal formation, not performance of numerous severable contracts, any illegal taint associated with purchase orders from Jaclyn in 1975, not pervading the purchase decisions of 1976. To conclude otherwise would forever bar enforcement, because of prior illegalities, of future contracts between the parties, a prospect anticipated by the very terms of Edison's "clearance policy." Lastly, a more discriminating judicial analysis is called for when a defense invokes a statute which declares the offender a disorderly person, N.J.S.A. 2A:170-88, as compared to the more serious offenses charged in the Nathan case. Ill. Rev. Stat. c. 38, § 29A-1.
[9] Talcoff supervised, in person, the placing of orders at Jaclyn's Fifth Avenue showrooms on March 17, 1976:

Q. At that time in March of 1976 you went there to look at the line that Jaclyn had for the upcoming late spring or fall season, did you not?
A. Probably would-I'm not sure which season we were in then but we went to look at the line, what they had available to buy.
Q. In March, 1976, Edison in fact did, as a result of the line which it saw, make purchases that were to come to you in June, July, August. Did you not?
A. Yes.
Q. Because those are the very same orders on D-40, the memo dated July 13, 1976, which you were talking about.
A. Right.